MAC-AIRE AVIATION CORPORATION ET AL. *v.* CORPORATE AIR, INC.

APPELLATE DIVISION OF THE CIRCUIT COURT

FILE No. CV 14-693-41581

Argued December 1, 1969—decided March 6, 1970

*William R. Moller,* of Hartford, for the appellant (defendant).

*Thomas F. Parker,* of Hartford, for the appellees (plaintiffs).

KOSICKI, J.   In March, 1969, the plaintiffs commenced a summary process action in the Circuit Court in the fourteenth circuit for recovery of premises alleged to have been leased to the defendant.   The claimed lease was on a month-to-month basis and essentially involved a portion of the plaintiffs' main storage hangar at Brainard Field, Hartford.   A more specific statement describing the leased premises was filed by the plaintiffs on motion of the defendant.   In addition to a general denial, the defendant filed various special defenses and a counterclaim for affirmative relief.   Upon motion of the plaintiffs, the counterclaim was stricken on May 1 *(Herman, J.)* as being improper and unauthorized by the summary process statute, General Statutes § 52-532.

On April 7, the defendant had claimed the case for the jury docket.   On May 12, the plaintiffs moved to strike it from the jury docket on the ground that the counterclaim had been ordered stricken.   This motion was granted *(Levine, J.)* on the authority of General Statutes § 51-266 and *Frank Miller & Co.* v. *Lampson,* 66 Conn. 432, 438.   The court ordered the case to be added to the docket of court cases and that it be assigned for trial without delay.   The case was tried, and after a detailed and comprehensive memorandum of decision, filed July 17, the court *(Casale, J.)* entered judgment for the plaintiffs against the defendant for the possession of the premises described in the complaint as amended. From this judgment the defendant has appealed.

The court's finding, which none of the parties moved to correct, recites the following facts. Brainard Field is a state airport located in Hart-

ford, Connecticut. It receives federal funds pursuant to the Federal Aviation Act of 1958. 72 Stat. 731, as amended, 49 U.S.C. §§ 1301–1542 (1964). The plaintiff Mac-Aire Aviation Corporation entered into a contract with the state of Connecticut, acting through the aeronautics commission, whereby Mac-Aire became the prime fixed base operator at Brainard Field on June 1, 1968. Under this contract, Mac-Aire began operations as prime fixed base operator on June 1, 1968. Mac-Aire assigned its rights under the contract with the state to its wholly owned subsidiary, Mac-Brainard, Inc. This assignment was expressly authorized by the contract. Both companies are hereinafter sometimes collectively referred to as "Mac." Under the contract with the state, certain parts of the airport were leased to Mac. Included were several areas of land. One leased plot of land contains thirty "T" hangars. Another leased plot contains a building which houses a pilot's lounge, operations and fueling facilities, offices and a hangar. Another plot of land leased to Mac contains a large hangar measuring 100 feet by 120 feet. It is this hangar which is the subject of this action.

The defendant, Corporate Air, Inc., has been operating commercially, rendering air-taxi and charter service, from Brainard Field since July, 1968, or earlier. Corporate Air first attempted to obtain a flight operator's license from the state aeronautics commission in late January, 1969. Although Mac-Aire was invited by another fixed base operator, C & R Conn. Air, Inc., to join it in opposing Corporate Air's application for a flight operator's license, Mac-Aire refused to do so, and it has not opposed the application. As of the time of trial, June, 1969, the aeronautics commission had not authorized the granting of a flight operator's contract to Corporate Air. Such a contract had been signed by Corporate

Air, but the state had not executed it as of the time of trial. This flight operator's contract provides in part as follows: "The Flight Operator shall have all the ancillary rights required for its performance as a Flight Operator of this agreement coming together with the general public and in addition thereto the Flight Operator shall have the non-exclusive rights hereinafter stated further: (a) The use of all public areas and facilities of the Airport including without limitation the runways, landing areas, taxi-ways, aprons, roadways, public automobile parking areas, runway lights, signals and other operating aids. (b) Said non-exclusive rights are limited as follows: Neither the Flight Operator nor the Flight Operator's employees or business invitees shall be permitted to use the leased area of any tenant or any fixed base operator or any other lessee or licensee of the State, except as a business invitee of said lessee of the State."

Up to the time of trial, Corporate Air had no contractual relationship with the state of Connecticut. In the latter part of the summer of 1968, Barry Lutin, an employee of Corporate Air, came to Mac and requested hangar space for one airplane, a Cessna 310. Mac leased hangar space to Corporate Air for the Cessna 310 for $111 per month. Later, one room, located on the southerly side of the hangar, was leased to Corporate Air, for use as an office and for storage, for $50 per month. At about the same time, Corporate Air acquired a second Cessna 310 airplane and sought space to hangar this plane, and Mac leased the hangar space therefor to Corporate Air. Since the fall of 1968 to the present time, Corporate Air has been in possession of the office and hangar space for the two Cessna 310s, for which rent was to be and has been paid to Mac on a monthly basis at the rate of $272 per month. Corporate Air occasionally put aircraft

other than the two Cessna 310s in the leased hangar
space. The area in the hangar leased by Corporate
Air is described in Mac's more specific statement,
also in a plaintiffs' exhibit. The open floor area
leased to the defendant is located in the southeast
corner of the hangar. This area was not delineated
physically, that is by painted lines or otherwise. The
southeast corner area of the hangar, as described
in the more specific statement and the exhibit, is the
part of the hangar Mac considered leased to Corpo-
rate Air. Corporate Air's aircraft were kept within
this area when inside the hangar. Mac's employees
did not move or otherwise exercise control over
Corporate Air's aircraft within the hangar. Mac's
employees did not do any maintenance work on Cor-
porate Air's aircraft. Maintenance on Corporate
Air's aircraft was done by its own employees. Cor-
porate Air had possession and control of its aircraft
within the hangar and moved its aircraft in and out
of the hangar at its own will.

On November 27, 1968, Mac caused a notice to quit
to be served on Corporate Air. On January 6, 1969,
Mac instituted a summary process action against
Corporate Air affecting the same hangar space as is
involved in the instant action. The prior action was
tried before the court on February 7 and 12, 1969.
In the present action, the parties stipulated that the
court could take judicial notice of the pleadings and
finding in that prior case. In it, the defendant, Cor-
porate Air, pleaded four special defenses. The first
special defense read in part: "1. The leasehold
agreement between the parties was entered into on
or about September 1, 1968 and provided an oral
lease through August 31, 1969. 2. Said oral lease
provided for a monthly payment of $287 in con-
sideration for the storage of two airplanes within
the hangar . . . ." The second special defense read
in part: "On December 10, 1968, the defendant

tendered rent in the amount of $287 for the month of December. Said tender was made by check, the funds of which were collected by the plaintiff on or about December 16, 1968. The effect of this payment vitiates any notice to quit." In rendering judgment for Corporate Air, the court in the prior action found that Mac had leased the premises, which were the same as are involved in the present case, to Corporate Air on a month-to-month basis but that the acceptance of rent by Mac during the pendency of the action vitiated the summary process proceedings and renewed the lease for one month.

The instant action was commenced after the expiration of the month for which the rent had been accepted. Here, the court also found that there are facilities in the greater Hartford area, and on Brainard Field, other than Mac's, available to general aviation for aircraft maintenance work. Mac intends to use and has a need for the subject hangar space for its retail and internal maintenance business.

Hartford Airmotive, Inc., had been a prime fixed base operator on Brainard Field. While Hartford Airmotive, Inc., was prime fixed base operator at Brainard Field, Simsbury Flying Service, Inc., and its principal, Barry Baker, were involved in two lawsuits against the state aeronautics commission attempting to force the aeronautics commission to grant a flight operator's contract to them. Those actions were brought in the Superior Court in Hartford County. They do not appear to have involved the rental or use of hangar facilities at Brainard Field. The judgments in those suits placed no burden on either Hartford Airmotive or any other prime fixed base operator. They make no reference to rights of any flight operator to use or rent hangars at Brainard Field.

On the foregoing facts, the court concluded that the relationship between the parties was that of lessor and lessee with respect to a parol month-to-month lease of the hangar space referred to herein and that the plaintiffs are entitled to the possession of the demised premises.

On the trial, the defendant made the following claims of law, which the court overruled: (1) The relationship between the parties was that of bailment and not of landlord and tenant; (2) the action of summary process did not lie under the circumstances disclosed; (3) the plaintiffs were required to make hangar space available to the defendant as a member of general aviation; (4) the Federal Aviation Act of 1958 requires the plaintiff to provide hangar space to the defendant; (5) the plaintiffs' action in seeking to evict the defendant is in violation of the two Superior Court judgments discussed in the paragraph above.

The assignment of errors is directed not only at the court's disposition of the foregoing claims but also at the court's action in depriving the defendant of its constitutional right to a jury trial; in striking the defendant's counterclaim; in unduly restricting the defendant in its cross-examination of certain witnesses; and in rejecting certain testimony, as appears in the exhibits properly annexed.

## I

The principal claim made by the defendant in its appeal is that it was deprived of its constitutional right to a trial by jury. Article first, § 19, of the constitution of Connecticut provides that the right of trial by jury shall remain inviolate. This identical provision was also contained in article first, § 21, of the constitutions of 1818 and 1955. Under this provision, no party has a constitutional right to a trial by jury of any action not so triable in 1818, when

the constitution of 1818 was adopted. This is true of actions established by statute since the constitution was adopted, unless, perhaps, the new remedy constitutes "a modification of existing remedies, so vital as to unduly limit and violate the right of trial by jury." *Meigs* v. *Theis*, 102 Conn. 579, 592; 31 Am. Jur. 569, Jury, § 20.

The trial court evidently struck the present case from the jury docket in reliance on General Statutes § 51-266, which provides, inter alia: "There shall be no right to trial by jury . . . in a summary process case in which money damages are not claimed." The force of the defendant's claim apparently is derived from a statute enacted in 1806 creating a procedure, unknown at common law, from which evolved the present action of summary process.[1] This statute permitted a trial by a jury of six. Statutes, 1808, p. 450, c. 23.

We do not agree with the defendant that it was entitled to a jury trial in this action as a matter of right and that § 51-266, so far as it purports to limit this right, is unconstitutional. In *Frank Miller & Co.* v. *Lampson,* 66 Conn. 432, which was an action of summary process, the defendant tenants requested a trial by jury but moved that they not be required to post any bond or recognizance for the payment of costs as required by the statute then in effect. They also requested a twelve-man jury although the statute provided for a jury of six. The court denied both of the defendants' requests. On review, the Supreme Court held (p. 438): "There was no error in these rulings of the court. The provisions of General Statutes, § 1356 [Rev. 1888], here called in question, are valid and constitutional, and no objection can now be urged to them which has not already been considered and overruled in the decisions of this

---

[1] See, e.g., *Frank Miller & Co.* v. *Lampson,* 66 Conn. 432, 433.

court. *Curtis* v. *Gill,* 34 Conn. 49; *Guile* v. *Brown,* 38 id., 237; *LaCroix* v. *County Commissioners,* 50 id., 321; *Seeley* v. *Bridgeport,* 53 id., 1."

From 1888 until 1949, our statutes governing summary process contained an identical provision for trial by a jury of six provided the moving party entered into a bond, with surety to the adverse party, in such sum as the court might order, conditioned for the payment of all costs in case final judgment was rendered against the moving party. Rev. 1888, § 1356; Rev. 1902, § 1080; Rev. 1918, § 6121; Rev. 1930, § 5973; Rev. 1949, § 8276. This provision was repealed in 1949 (Sup. 1949, § 664a; Cum. Sup. 1955, § 3218d); and since then cases of summary process, where no damages are claimed, are triable only to the court. General Statutes § 51-266.

As our Supreme Court observed in *Ruttenberg* v. *Dine,* 137 Conn. 17, 18, 19, the tenant, in a case very similar to the one before us, is caught between Scylla and Charybdis. "On the one hand, if the General Assembly could lawfully deprive litigants of a jury trial in summary process proceedings, the court's denial of the motion [for jury] would afford the tenant no cause for complaint. If, on the other hand, her right to a trial by jury is one guaranteed by the constitution, the legislative action in repealing § 8276 [Rev. 1949] was void. . . . Under such circumstances, § 8276 would remain applicable and controlling. Its provisions would entitle the tenant to have certain issues determined by a jury, but with a single limitation upon that right. By its terms she was required to move for jury trial on or before the return day. This she did not do." No error was found in the court's denial of the claim for a jury trial.

In the instant case, the record shows that the complaint was returnable on March 17, 1969. It was

claimed to the jury on April 7 and stricken from the jury docket on May 16. Thus, even if the only statute under which a jury trial was provided was invalidly repealed, the defendant, it is obvious from the comment of the Supreme Court cited above, failed to meet the requirements of the only statute which it could invoke to support its position. In *Ruttenberg*, supra, it was held that the delay in filing a motion for a jury trial was sufficient to sustain the court's denial of the motion without its being necessary to consider the constitutionality of the repealing statute.

The defendant places considerable reliance on *Swanson* v. *Boschen*, 143 Conn. 159, in which the plaintiff sued under a rent control statute then in effect to recover damages from the landlord for the overpayment of rent. The statute provided that such actions were to be heard by a court without a jury. The Supreme Court held that the statutory prohibition of a trial by jury was unconstitutional. The court stated that the action under the rent control statute was essentially an action of debt. An action on a debt, at the time of the adoption of the constitution of 1818, was triable before a jury. The court held that to deny a jury trial in such a case would amount to an elimination of the right to a jury trial in a common-law cause of action wherein that right had existed from the very origin of the cause of action. The legislature could not take away trial by jury in such a case by defining the common-law action as one created by statute, because (p. 164), "[i]f it could, the legislature, by the process of giving legislative sanction to common-law causes of action, could, in the course of time, obviate the guarantee of jury trial completely."

The case at bar stands on a vastly different footing. Summary process is not a suit having its origins

in the common law as of the time of the adoption of the constitution of 1818. Even at that time, the forerunner of the summary process action was merely a statutory cause of action. Statutes, 1808, p. 450, c. 23. Logically, this would put summary process, and any limited right to a jury trial incident to it, in a class with small civil cases and later statutory causes of action, wherein the right to trial by jury may be withdrawn at the discretion of the legislature. *Guile* v. *Brown,* 38 Conn. 237, 242. It is not in a class with the causes of action in which the right to trial by jury has long existed in the common law. Reliance, however, upon such logical deductions is unnecessary. The decision in *Frank Miller & Co.* v. *Lampson,* 66 Conn. 432, has already placed summary process in the class of cases wherein trial by jury is discretionary, instead of in the class of cases in which trial by jury is constitutionally inviolate. By statute, there is no right to trial by jury in an action of summary process not involving money damages. As discussed above, there is no constitutional infirmity in this statute.

## II

The defendant assigns error in the court's striking the counterclaim, thereby depriving the defendant of its rights thereunder. This assignment is based on the further claims of error in the conclusion of the court that the relationship of the parties arose out of a lease for one month, and not from a bailment as asserted by the defendant, and that summary process was a proper proceeding under the circumstances, and in the failure of the court to apply the Federal Aviation Act of 1958, which, it was claimed, required the plaintiffs to provide hangar space to the defendant as a member of general aviation and of the general public. All these claims of error are so interrelated that we shall consider them together.

The counterclaim alleged that the defendant is a flight operator at Brainard Field and had requested a flight operator's contract from the state department of aeronautics and from the plaintiffs. It further asserted that the aeronautics department had insisted that the contract be obtained from the plaintiffs, who had refused to give one. By way of relief, the defendant demanded that the plaintiffs be found to have violated their contract with the state in failing to offer the defendant a flight operator's contract; that they be ordered to enter into negotiations for such a contract; and that the defendant be accorded such legal and equitable relief as the court deemed necessary.

It is quite plain that the counterclaim does not state a cause of action or raise any justiciable issue. No provision of the state law requires the plaintiffs to rent hangar space to the defendant. The plaintiffs cannot grant a flight operator's contract. They have no authority to do so. The aeronautics commission alone has such authority. The commission's regulations (Conn. Dept. Regs. § 15-41-44 [a]; see General Statutes § 15-41) provide that a fixed base operator can pursue his commercial operation only under a lease agreement with the aeronautics commission, or anyone who has an operational agreement or sublease with the authorized base operator, or the department of aeronautics, which agreement or sublease has been approved in writing by the aeronautics commission. Admittedly, the defendant did not qualify under this regulation, and the court so found.

The defendant has cited no authority which requires the plaintiffs to rent part of their hangar on an exclusive basis to the defendant. Hangar space and a flight operator's contract are not interconnected. The decision of the plaintiffs not to rent

hangar space to the defendant does not prevent the defendant from getting a flight operator's contract. The plaintiffs are not the only fixed base operator on Brainard Field. In any event, the flight operator's contract the defendant eventually signed provided that it had no preordained right to use of the plaintiffs' hangars. The court correctly found that under this contract neither the defendant nor its employees or business invitees "shall be permitted to use the leased area of any tenant or any fixed base operator or any other lessee or licensee of the State, except as a business invitee of said lessee of the State."

The court was obliged to strike the counterclaim for another cogent reason. The Supreme Court and this court have consistently held that summary process actions are to be limited strictly to issues within the statutory provisions. See such cases as *Webb* v. *Ambler,* 125 Conn. 543, 550–51; *Davidson* v. *Poli,* 102 Conn. 692, 695; *Sun Oil Co.* v. *Keane,* 2 Conn. Cir. Ct. 524, 525 n.1. The issues embraced by the counterclaim are hardly "a few simple ones within the express scope of the statutory provisions." *Webb* v. *Ambler,* supra.

### III

The defendant claims that no lease existed between the parties with respect to the open floor area of the hangar. It claims that the relationship between the parties was one of bailment. The subordinate facts found by the court do not support that position. In fact, the defendant's draft finding was void of any proposed findings of subordinate facts which would support a conclusion that a bailment, not a lease, existed. The subordinate facts contained in the finding clearly sustain the conclusion that a lease existed. The defendant must concede that the finding

is complete and accurate, since no attempt has been made to correct it as prescribed by § 981 of the Practice Book.

In the prior, aborted action between the parties, the defendant in its pleadings described the relationship as a lease. The trial court in that action found that a lease existed. The judgment in that proceeding would not be res judicata of the issues presented in the instant case. The pleadings and claims of the defendant, however, are relevant and persuasive as judicial admissions that it was in fact a tenant of the plaintiffs. Since the defendant previously availed itself of the benefit of the statute, it could not now disclaim its applicability to it. The court could well take that into consideration in connection with the defendant's present claim that the relationship between the parties was that of bailor-bailee. This presented a factual situation which first had to be determined by the court; and we cannot impute error to the court's finding that a month-to-month lease existed between the parties and that on its termination the plaintiffs were entitled to resort to the statutory remedy of summary process.

An essential element of bailment is control. The finding contains no facts tending to show that the existing arrangement was a bailment. On the contrary, there was a total retention of control by the defendant. The airplanes of the defendant were not moved within the hangar by the plaintiffs' employees. These employees did not do any maintenance work on the defendant's aircraft. The work was done by the defendant's own employees. The defendant, as found by the court, had possession and control of its aircraft within the hangar and moved them in and out of the plaintiffs' hangar at its own pleasure. By analogy, the airplane hangar use, an important issue in this case, is comparable to the

automobile parking lot or garage situation. In *Malone* v. *Santora,* 135 Conn. 286, 290, our Supreme Court followed "the large number of authorities which have recognized this basic distinction and held assumption of control the determinative factor . . . . Whether a car owner merely hires a place to put his car or has turned its possession over to the care and custody of the lot operator depends on the place, the conditions and the nature of the transaction."

Another fact found by the court, supporting its conclusion that a lease existed, was that the defendant put other airplanes in the rented space. It alone designated which airplanes would be placed there. Thus the court could reasonably find that even the defendant considered its contract to be a lease rather than bailment of two airplanes. The finding of the court that there was a lease and not a bailment between the parties cannot be disturbed.

One of the defendant's assignments as noted above —that the court erred "[i]n finding that summary process was a proper procedure under the circumstances"—requires no additional comment. This assignment lacks specificity. It does not set out the reason why summary process was improperly pursued. Since the court could properly conclude on the evidence and the applicable law that a lease existed between the parties, it would follow that § 52-532 provided the appropriate remedy and that summary process would lie.

The defendant next makes two claims of error, namely, that the court failed to apply the Federal Aviation Act of 1958, under which, it was claimed, the plaintiffs were required to provide hangar space to the defendant as a member of general aviation, and that the court failed to find that the plaintiffs were required to make hangar space available to the

general public. There is nothing in the evidence or in the law which would support such a conclusion. The court was not required to make such a finding. The defendant has not attacked the court's finding, nor has it taken any of the steps available to have such a conclusion or the subordinate facts which would support it included in the finding. Practice Book §§ 981–985. Moreover, such an issue was wholly beyond the scope of the pleadings. This action is limited to space within the plaintiffs' hangar consisting of one room and floor space for certain designated aircraft. The court found that the plaintiffs desire to terminate the defendant's use of this area so that it may be utilized in the plaintiffs' own operations. This the plaintiffs have the right to do under the lease with the state. Mac has paid and continues to pay for that right. Even if the claim of the defendant were accepted as valid, there is no requirement or obligation resting on the plaintiffs that the defendant, as one member of general aviation, be given this particular space to the exclusion of all others, including the lessor. The court has found that the plaintiffs need this space for their own expanding operations, and the questions of present availability or curtailing competition amount to no more than an unsupported challenge of the plaintiffs' right to use their own spaces within the terms of their lease with the state.

The defendant lays heavy stress upon § 308 of the Federal Aviation Act of 1958. 72 Stat. 750, 49 U.S.C. § 1349. This section relates to the expenditure of federal funds for certain airports. One sentence reads as follows: "There shall be no exclusive right for the use of any landing area or air navigation facility upon which Federal funds have been expended." 72 Stat. 750 § 308 (a), 49 U.S.C. § 1349 (a). The terms "landing area" and "air navigation facility" are defined by § 101 of the act: " 'Air

navigation facility' means any facility used in, available for use in, or designed for use in, aid of air navigation, including landing areas, lights, any apparatus or equipment for disseminating weather information, for signaling, for radio-directional finding, or for radio or other electrical communication, and any other structure or mechanism having a similar purpose for guiding or controlling flight in the air or the landing and take-off of aircraft." 72 Stat. 737 § 101 (8), 49 U.S.C. § 1301 (8).  " 'Landing area' means any locality, either of land or water, including airports and intermediate landing fields, which is used, or intended to be used, for the landing and take-off of aircraft, whether or not facilities are provided for the shelter, servicing, or repair of aircraft, or for receiving or discharging passengers or cargo."    72  Stat.  739  § 101 (22),  49  U.S.C. § 1301 (22).

By no sensible construction of that statute can it be held that it has any reference to the leasing of hangars, which is the only significant issue present here.   In cases where such a situation has been squarely in issue, the courts have negated the theory pressed by the defendant.  Thus, in *Hillsborough County Aviation Authority* v. *National Airlines,* 63 So. 2d 61 (Fla.), the Supreme Court of Florida held that a provision of the Civil Aeronautics Act of 1938 (52 Stat. 986 § 303, 49 U.S.C. § 453) which is essentially the same as in the act quoted above applied only to areas capable of use in common by numerous airline operators.  In *Hillsborough,* the aviation authority had leased space ideally located on the top of a large hangar to one airline for the purpose of erecting a large neon sign.  Another airline objected on the ground that the lease amounted to an exclusive right since that privilege could not be extended to other airlines. The court held (p. 63) : "It will be seen, then, that

the only 'exclusive right' which the authority is prohibited . . . from granting is as to landing areas and air navigation facilities. Such areas and facilities are capable of use *in common* by all air transport operators." (Italics intact.)

An even broader rule was enunciated in *Southern Airways Co.* v. *DeKalb County,* 102 Ga. App. 850, which involved the construction of provisions of the state code as well as the federal Civil Aeronautics Act of 1938. The county had leased to the plaintiff the exclusive right to run a flying school at the airport owned by the county. In denying the contention that this violated the prohibition against the grant of exclusive rights contained in the federal statute, the court held that the agreement was valid. The agreement expressly provided that the landing areas and air navigation facilities of the airport should always be open and available to all airline transportation companies without discrimination. Id., 856.

The Supreme Court of New Hampshire has stated unequivocally that the language of § 303 of the federal Civil Aeronautics Act of 1938 does not apply to hangar buildings on a county airport receiving federal funds. *Park* v. *Manchester,* 96 N.H. 331. The New Hampshire statutes contained a prohibition against the grant of exclusive rights which was substantially similar to that contained in the federal act. The defendant county had leased to the plaintiff certain hangars and administration buildings. The lease also provided that the lessee was to have the exclusive right at the airport so far as commercial flying activities were concerned. Upon eviction of the plaintiff by the county, he sued for a breach of the lease. On appeal, the court held that although the trial court correctly found that the lease was invalid in its purported grant of a right to exclude

others from using the landing area or air navigation facilities for commercial purposes, it was equally correct in finding that "so far as the buildings which were leased by the defendant to the plaintiffs [were concerned] the statutes in question do not apply." Id., 334.

In another decision cited in argument, the court found a relationship of bailor-bailee to exist, but on clearly distinguishable circumstances. *Baruch* v. *Beech Aircraft Corporation,* 175 F.2d 1. In that case, the plaintiff had purchased an airplane from the defendant but arranged for a future delivery. The court held that the defendant had possession and control over the aircraft and that a bailor-bailee relationship had been created. The case is inapposite to the situation under review. We also find inapplicable the following cases relied on by the defendant in support of its claim of bailment: *Hendren* v. *Ken-Mar Airpark, Inc.,* 191 Kan. 550, 560; *Ogden* v. *Transcontinental Airport of Toledo, Inc.,* 39 Ohio App. 301, 306. In each of these cases it was held that a factual situation not present here involved the relationship of bailor-bailee.

In its brief and argument the defendant emphasized that the plaintiffs' action, if permitted, would tend to encourage monopoly to the exclusion of other operators. The ready answer to that assertion is that there is nothing in the finding or evidence to sustain such a claim. If it had validity, then it would be expected that the state and federal aeronautics commissions would have been parties to this action or to an independent suit to determine whether the plaintiff in any way violated the state or federal regulations. They are not parties to any such action; furthermore, there is no evidence that any regulatory measure has been pursued by them calling for judicial review. We cannot indulge in

speculation on what the issues, evidence and results might have been. *Butler Aviation Co.* v. *Civil Aeronautics Board,* 389 F.2d 517, 519.

The final assignments of error consist of an attack on fourteen separate rulings on evidence made by the trial court. Practice Book § 226 requires: "Whenever an objection to the admission of evidence is made, counsel shall state the grounds upon which it is claimed or upon which objection is made, succinctly and in such form as he desires it to go upon the record, before any discussion or argument is had. Argument upon such objection shall not be made by either party unless the court requests it and, if made, must be brief and to the point." The requirements of this rule are thoroughly examined and explained in *Casalo* v. *Claro,* 147 Conn. 625, 628–29.

It is not disputed that the trial court may restrict the examination of witnesses to evidence which is competent, material and relevant; and when the examination has been carried as far as will serve to develop the issues involved and aid the search for the truth, the court may curtail the length and the limit of the examination. " 'To do this so as not to unduly restrict the examination and at the same time not permit it to be stretched to unseemly limits, requires the exercise of the wisest discretion and the highest judgment of the trial court. . . . The test of cross-examination is the highest and most indispensable test known to the law for the discovery of truth.' " *Fahey* v. *Clark,* 125 Conn. 44, 46, quoting from *Bishop* v. *Copp,* 96 Conn. 571, 575; *Papa* v. *Youngstrom,* 146 Conn. 37, 40.

As to other rulings, the defendant asserts error in not being allowed enough latitude fully to resolve the issues in the trial of this matter. We have examined the exhibits annexed to the assignment of

errors and can find no abuse of the court's sound discretion in its rulings excluding the questions asked on cross-examination. They were not relevant to the only issue being tried and did not pertain to any matters raised by the pleadings or touched on in direct examination. The first three rulings related to the defendant's claim of discrimination; the fourth was for the purpose of showing that the purpose of the plaintiffs was to eliminate competition; the fifth had reference to conditions occurring two or three months before the present cause of action accrued; the fifth and seventh clearly sought to obtain from the witness an interpretation of the contract between the state and the plaintiffs—a question of law; and the sixth attempted, again, to raise the claim of discrimination by proposing a hypothetical question based on assumptions rather than facts in evidence. The court's rulings were not erroneous.

The remaining six assignments are pressed on the sole ground that the testimony of certain witnesses was "rejected" by the court. No specific reasons are given by the defendant. No lengthy discussion is required of the basic right of a trier to accept or reject evidence which is conflicting; its credibility is for the trier to decide. We cannot usurp the trial court's function unless it appears that the decision is one contrary to that on which reasonable men could not differ.

The defendant sought to elicit from the witnesses their interpretation of the plaintiffs' contract with the state or of the Connecticut laws and regulations governing aeronautics. These were questions not calling for qualified expert opinion; by indirection, they invaded the very function that only the court could exercise. Furthermore, the testimony of a witness charged by the aeronautics department with

the preparation of leases between the state and fixed base operators such as the one entered into by the plaintiffs was in its entirety of no help to the defendant. Such an excerpt as was contained in the exhibit could hardly cause any harm by its exclusion. We are of the opinion that in the final six rulings challenged in the assignment of errors the court was not in error.

There is no error.

In this decision DEARINGTON and KINMONTH, Js., concurred.