**CONTINENTAL BUS SYSTEM, INC.**

v.

**The CITY OF DALLAS and the City of Fort Worth.**

Civ. A. No. 3–7511–F.

United States District Court,
N. D. Texas,
Dallas Division.

Dec. 17, 1974.

Ralph Pulley, Jr., D. Paul Stafford, Dallas, Tex., for plaintiff.

S. G. Johndroe, City Atty., Arthur R. Petersen, Asst. City Atty., Fort Worth, Tex., N. Alex Bickley, T. Alex Eastus and Joseph G. Werner, Dallas, Tex., for defendants.

## MEMORANDUM OPINION

ROBERT W. PORTER, District Judge.

Planning, constructing and operating the world's largest airport equidistant between them has markedly attenuated the traditional rivalry of the cities of Dallas and Fort Worth. The new airport has spawned considerable litigation, however, and the cities that jointly own and operate it consequently often find themselves aligned on the same side of the "versus" in lawsuits arising from their joint venture.

This, one of those numerous suits, requires the cities to defend their joint operation of a bus line between the airport and the downtown areas of both cities, and their prohibition of competition from the Plaintiff, Continental Bus System, Inc. (known to the public as Continental Trailways).

The parties, agreeing that there are no questions of fact, have placed before the Court several questions of law on cross-motions for summary judgment. The principal issue is whether Dallas and Fort Worth, by jointly operating their bus line, Surtran,[1] and by enacting identical ordinances prohibiting unlicensed competition with Surtran, are illegally restraining interstate commerce.

A careful examination of the authorities convinces me that while one could question the wisdom of the cities' decision, one cannot question their legal right to implement that decision. Therefore, the Court will grant the cities' motions for summary judgment and deny the plaintiff's motion for summary judgment. My reasons will be detailed below in this opinion, which is submit-

---

1. Surtran (an abbreviated form of "surface transportation") is not to be confused with Airtrans, the automated "people mover" system for transporting passengers and baggage between terminals and parking lots within the airport boundaries.

ted in lieu of findings of fact and conclusions of law.

## I. THE HISTORICAL BACKGROUND

Another judge of this Court, in a case involving these two cities and their new airport, has traced the evolution of civil animosity into partnership. City of Dallas, Texas, v. Southwest Airlines Co., 371 F.Supp. 1015 (N.D.Tex.1973) (Taylor, C. J.), aff'd, 5th Cir., 494 F.2d 773, rehearing denied 496 F.2d 1407 (5th Cir. 1974), cert. denied, 43 U.S.L.W. (U.S. Dec. 16, 1974) (No. 74–324). The interested reader will find more details in Judge Taylor's opinion, but it is enough for our purposes to know that after operating competing airports for many years, Dallas and Fort Worth jointly constructed a huge regional airport between the two cities. In large part, the airport is a tribute to farsighted leaders from both cities, but the role of the Civil Aeronautics Board should not be underestimated. It was the CAB that let it be known it would designate either Fort Worth's or Dallas' airport as the sole facility for both cities unless they agreed upon a solution. Unlike Dallas' Love Field and Fort Worth's Greater Southwest International Airport, which were within the city limits of the respective cities, D/FW Regional Airport sprawls over parts of Grapevine, Euless and Irving. A very small portion lies within Fort Worth's city limits. All terminal buildings are in Grapevine, as is the "spine road" which is the only highway entering the airport.

When D/FW Regional opened to traffic in January of 1974, Surtran commenced regularly scheduled shuttle service between the airport and downtown Dallas and Fort Worth. Surtran's fleet consists of 45 new intercity-type buses purchased for more than $2.3 million.[2]

Continental, as authorized by a permit, operated sight-seeing buses through D/FW Regional while it was under construction. But apparently the owning cities intended from the very first that once the airport opened, Surtran and *only* Surtran would provide bus service there. (When Love Field was the principal Dallas airport, both Continental and the Dallas Transit System ran buses there.)

This lawsuit previously was assigned to my colleague Judge Mahon and was transferred to me shortly after my appointment to this Court. Judge Mahon used the Court's good offices to urge the parties to negotiate in good faith to attempt to reconcile their dispute. Continental and Surtran did negotiate, and Continental submitted a formal application for a permit to load passengers at D/FW, accompanied by proposed time-tables for twelve buses daily. The proposed fare was $1.30 between Dallas and the airport and $1.40 from Fort Worth to the airport, plus in each case the amount of the per-passenger charge made by airport authorities to Continental for the privilege of discharging and picking up passengers at the airport. This charge was never worked out. (Surtran fares, by contrast, are $2.50 between the airport and either city. Airport employees—whether they work for one of the cities, Surtran, an airline, a concessionnaire, or whomever—ride for only $1.00.) Ultimately, Continental's application was denied.

## II. JURISDICTION AND CAUSES OF ACTION

In its amended complaint, Continental invokes this Court's federal question jurisdiction and claims that more than $10,000 is in controversy. 28 U.S.C. § 1331. The causes of action, Continental continues, arise under the Federal Aviation Act of 1958, 72 Stat. 731, 49 U.S.C. § 1301 et seq.; the National Transportation Policy Act of 1940, 54 Stat. 899; 42 U.S.C. § 1983; the Commerce Clause and the fifth and fourteenth amendments to the Constitution, U.S.Const.

---

**2.** Invariably Surtran calls its buses "coaches"; carrying the euphemisms one step further, it labels its bus drivers "coach captains."

art. I, § 8, cl. 3 and amend. V and XIV; the Sherman Antitrust Act, 15 U.S.C. §§ 1–7; and Part II of the Interstate Commerce Act, 49 U.S.C. § 301 et seq. In addition, Continental has pleaded state causes of action under Texas statutes and the Texas Constitution which are based on a common nucleus of operative fact with the federal causes of action. Continental requests a declaratory judgment pursuant to 28 U.S.C. § 2201 and an injunction against the cities pursuant to 28 U.S.C. § 2202.

There is no serious question of this Court's jurisdiction, although the City of Fort Worth has urged the Court to abstain and both cities vigorously insist that Continental has no cause of action. I find that an actual controversy exists between the parties, and that this Court has jurisdiction under 28 U.S.C. § 1331 to resolve it. The alleged causes of action will be discussed one by one (although not in the order listed in the complaint).

## III. NATIONAL TRANSPORTATION POLICY ACT AND INTERSTATE COMMERCE ACT

■ Continental maintains that the cities' exclusion of it from the airport prevents it from serving routes that the Interstate Commerce Commission has authorized it to serve, and therefore is an unlawful violation of the National Transportation Policy Act of 1940 and Part II of the Interstate Commerce Act, 49 U.S.C. § 301 et seq. In the Statutes at Large (but not in the codification) is found the congressional policy "to pro-

vide for fair and impartial regulation of all modes of transportation subject to the provisions of this [Interstate Commerce] Act . . . ." 54 Stat. 899, the full text of which is quoted in the margin.[3] Assuming for the moment, without deciding, that Congress intended to create a cause of action in this statute, the question becomes whether Surtran's airport-to-downtown shuttle is a mode of transportation subject to the Interstate Commerce Act. The question is answered in the negative by National Bus Traffic Assn. v. United States, 249 F.Supp. 869 (N.D.Ill.1965), aff'd 382 U. S. 369, 86 S.Ct. 538, 15 L.Ed.2d 422 (1966). That case, like this one, involved specialized transportation of airline passengers and their baggage from airports. The three-judge district court wrote: "Surely the final phase of the journey on land from the airport where the plane descends to the city where the air trip ends is incidental to the transportation by air." 249 F.Supp. at 873. Similarly, I find that Surtran's operations are incidental to air transportation and thus are exempted from coverage of the Interstate Commerce Act by 49 U.S. C. § 303(b), which provides in part an exclusion for "transportation of persons or property by motor vehicle when incidental to transportation by aircraft . . . ." Thus I conclude that Continental's attempted action under the National Transportation Policy Act must fail.

## IV. SHERMAN ANTITRUST ACT

[2] Continental complains that the cities have violated the Sherman Anti-

3. It is hereby declared to be the national transportation policy of the Congress to provide for fair and impartial regulation of all modes of transportation subject to the provisions of this Act, so administered as to recognize and preserve the inherent advantages of each; to promote safe, adequate, economical, and efficient service and foster sound economic conditions in transportation and among the several carriers; to encourage the establishment and maintenance of reasonable charges for transportation services, without unjust discriminations, undue preferences or advantages, or unfair or de-

structive competitive practices; to cooperate with the several States and the duly authorized officials thereof; and to encourage fair wages and equitable working conditions;—all to the end of developing, coordinating, and preserving a national transportation system by water, highway, and rail, as well as other means, adequate to meet the needs of the commerce of the United States, of the Postal Service, and of the national defense. All of the provisions of this Act shall be administered and enforced with a view to carrying out the above declaration of policy.

trust Act by creating a monopoly through granting an "exclusive franchise" to Surtran. Eliminating all competition and charging a higher fare than Continental proposed to charge constitutes an illegal combination and conspiracy between the defendants, according to Continental. The result, it continues, is harm to the traveling public in interstate commerce.

Congress has outlawed certain contracts, trusts and conspiracies in restraint of trade. At first glance, it would appear that 15 U.S.C. § 1, the opening section of the Sherman Act, would encompass what the cities have done with Surtran. Moreover, 15 U.S.C. § 2 prescribes a criminal penalty for anyone who monopolizes "any part of the trade or commerce among the several States." Unfortunately for Continental, the Supreme Court, after examining the Sherman Act's words and history, pronounced it "a prohibition of individual and not state action." Parker v. Brown, 317 U.S. 341, 352, 63 S.Ct. 307, 314, 87 L.Ed. 315, 326 (1943). Lower courts consistently have followed this rule exempting governmental activities from the congressional ban on monopolistic enterprises. *See* Ladue Local Lines, Inc. v. Bi-State Development Agency, 433 F.2d 131 (8th Cir. 1970), a case brought by a private bus company against an agency created by the states of Missouri and Illinois. The court held that the agency's entry into transportation was authorized by the states' legislatures and therefore was not subject to the antitrust laws. 433 F.2d at 132.

I find that Continental has no cause of action under the Sherman Antitrust Act.

## V. FEDERAL AVIATION ACT

■ One of Continental's themes in this suit is that the cities have granted an "exclusive franchise" to Surtran. This franchise creates a monopoly prohibited by 49 U.S.C. § 1349(a), Continental insists. The text of the statute is quoted in the margin,[4] but in essence it provides that if any federal funds have been spent on the construction of "any landing area or air navigation facility," then no one shall have an exclusive right to its use. Continental points out that federal funds were used at D/FW Regional and concludes that the law prohibits Surtran's exclusive right to operate there. I cannot agree that this is the law.

Continental apparently equates sidewalks and curbs, at which buses load passengers, with "landing areas" and "air navigation facilities." The statutory definitions of these terms do not agree with Continental's position. "Landing area" is defined in 49 U.S.C. § 1301(22) as a locality, including airports, which is used or intended to be used for the landing and take-off of aircraft. An "air navigation facility," according to 49 U.S.C. § 1301(8), is a device used to aid navigation of aircraft, such as lights and radios. Thus even if the cities had granted Surtran an exclusive franchise—as contrasted with operating it themselves—Surtran's operations would not be within the statute in

---

4. No Federal funds, other than those expended under this chapter, shall be expended, other than for military purposes (whether or not in cooperation with State or other local governmental agencies), for the acquisition, establishment, construction, alteration, repair, maintenance, or operation of any landing area, or for the acquisition, establishment, construction, maintenance, or operation of air navigation facilities thereon, except upon written recommendation and certification by the Administrator that such landing area or facility is reasonably necessary for use in air commerce or in the interests of national defense. Any interested person may apply to the Administrator, under regulations prescribed by him, for such recommendation and certification with respect to any landing area or air navigation facility proposed to be established, constructed, altered, repaired, maintained, or operated by, or in the interests of, such person. There shall be no exclusive right for the use of any landing area or air navigation facility upon which Federal funds have been expended.

question, just as hangar leasing was held not to be within the statute in Mac-Aire Aviation Corp. v. Corporate Air, Inc., 6 Conn.Cir. 238, 270 A.2d 849 (1970). It seems fairly obvious that the congressional purpose of this statute was to prohibit an owner or operator of an airport built partly with federal funds from allowing, say, one airline to do business there while forbidding another airline to land there. It does *not* forbid the cities of Dallas and Fort Worth from operating their *own* bus service at the airport to the exclusion of a privately owned bus company.

## VI. FEDERAL CIVIL RIGHTS ACTS

■ Continental correctly states, in its brief supporting its motion for summary judgment, that 42 U.S.C. § 1983 gives this Court jurisdiction to redress the deprivation, by persons acting under color of state law, of the plaintiff's federally assured rights, privileges and immunities.[5] In this branch of its argument, Continental reasons that the cities have singled it out as a special target of discrimination and have denied it due process of law in contravention of the guarantees of the fourteenth amendment. At first blush, the argument sounds plausible. Once again, however, Supreme Court decisions leave no doubt that Continental's position is untenable. In Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), the Court reviewed the legislative history of § 1983 and concluded that it was not intended to apply to municipal corporations. More recently, the Court re-examined the statute and reaffirmed that cities are not among the "persons" mentioned in the act, regardless of whether legal or equitable relief is sought. City of Kenosha v. Bruno, 412 U.S. 507, 93 S.Ct. 2222, 37 L.Ed.2d 109 (1973).

Thus there can be no doubt that Continental has no cause of action under § 1983.

## VII. TEXAS LAW

The theme of Continental's pendent jurisdiction count is that the cities' alleged monopoly of the bus business at D/FW Regional violates both the Texas Constitution and a state statute. The constitutional provision in question reads: "Perpetuities and monopolies are contrary to the genius of a free government, and shall never be allowed." Vernon's Ann.St. Tex.Const. art. 1 § 26. The statute cited provides that every monopoly, trust, and conspiracy in restraint of trade, as defined in the code, is illegal and prohibited. Tex.Bus. & Comm.Code Ann. § 15.04, V.T.C.A (1968).

■ This Court is not obligated to decide these pendent jurisdiction claims. United Mine Workers v. Gibbs, 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). Nevertheless, in the interest of resolving this dispute in one forum rather than two, I have examined these claims and find them lacking substance.

Continental cites the venerable Texas case of City of Brenham v. Brenham Water Co., 67 Tex. 542, 4 S.W. 143 (1887) for the proposition that the quoted constitutional provision prohibits a monopoly created by a political subdivision of the state that gives a person an exclusive right for a definite period of time to buy or sell or pursue a designated employment. While the *Brenham* case is probably Continental's most helpful case, I believe it important to remember that the court wrote: "There are, however, certain classes of exclusive privileges which do not amount to monopolies." 4 S.W. at 153.

The Court elaborated somewhat a few pages later:

It will not do to say that an exclusive right in a municipal corporation to operate water or gas works stands upon the same ground as does such exclusive right held by a private corpora-

5. Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdic-

tion thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

tion . . . . In the one case the exclusive right may create a monopoly, and in the other not. 4 S.W. at 155–156.

Several years later, the Supreme Court of the United States had occasion to comment on the *Brenham* case:

> Without expressing an opinion upon the point involved in that case, we are content to say that an ordinance granting a right to a water company for 25 years to lay and maintain water pipes for the purpose of furnishing the inhabitants of a city with water does not, in our opinion, create a monopoly' . . . City of Walla Walla v. Walla Walla Water Co., 172 U.S. 1, 14–15, 19 S.Ct. 77, 83, 43 L.Ed. 341, 347 (1898).

It is true that another case cited by Continental clearly says, "The City does not have a right to grant an exclusive franchise to itself or anyone else. Article 1, Section 26, Constitution of Texas . . ." Lea County Electric Cooperative, Inc. v. City of Plains, 373 S.W.2d 90, 93 (Tex.Civ.App.—Amarillo 1963, writ ref'd n. r. e.). This statement, however, is dicta since the court made clear the reason it affirmed the lower court's dismissal of the electric cooperative's suit against the city was that the district court lacked jurisdiction of the action.

Other than the Amarillo Court of Civil Appeals dicta, Texas courts have not been so strict in interpreting the law against monopolies. Looking not to the state constitution but instead to statutes, another court wrote that Texas courts had uniformly recognized four exceptions to the principle that exclusive contracts create monopolies. One of the four, and the only one relevant to this case, is the situation in which an exclusive right or privilege is granted upon the grantor's own property or premises. State v. Gulf Refining Co., 279 S.W. 526, 530 (Tex.Civ.App.—Austin 1925, writ ref'd).

Two excellent examples of this exception are found by looking to yesteryear

and the halcyon days of Texas railroading. There once was a time when the Weatherford, Mineral Wells & Northwestern Railway Co. carried so many passengers between Weatherford and Mineral Wells that it sued to restrain J. F. Lewis and his agents from boarding its trains and soliciting passengers to use his transfer line and livery service in Mineral Wells, which then was a noted health resort. The railroad had franchised T. J. Green, a competitor of Lewis, to solicit business aboard its trains. Lewis insisted that this arrangement was an illegal monopoly; the court found otherwise, saying that the railroad's action was reasonable and did not interfere with any right of Lewis. Lewis v. Weatherford, M. W. & N. W. Ry. Co., 31 Tex.Civ.App. 48, 81 S.W. 111 (1904, writ ref'd).

In those days the city of Bowie was prosperous enough to support two railroad depots. The Rock Island arranged with Bowie Cab and Transfer Company —exclusively—to transfer its passengers to the Fort Worth & Denver's depot several blocks away. The Rock Island obtained an injunction prohibiting a competing hackman, Clisbee, from entering its premises to solicit business, although Clisbee and others could enter the depot and grounds to serve a customer with whom they had a *previous* contract. The court held that the Rock Island acted well within its rights and did not violate the state rule against monopolies or federal antitrust statutes. Clisbee v. Chicago, R. I. & G. Ry. Co., 230 S.W. 235 (Tex.Civ.App.—Fort Worth 1921, writ ref'd).

Finally, two more recent Texas cases deserve mention. City of Corpus Christi v. Continental Bus Systems, Inc., 445 S. W.2d 12 (Tex.Civ.App.—Austin 1969, writ ref'd n. r. e. 453 S.W.2d 470 [1970]). In that case, Continental obtained from the district court an injunction against the city's operation of its municipally owned bus line to its airport located outside the city limits. The appellate court held that the Texas Railroad Commission lacked jurisdiction

over the city's operation of its own bus company and vindicated its extraterritorial service to the airport and other locations. The court did not discuss the law pertaining to monopolies, but of course the fact situation is analogous to the one at bar. In fact, in the *Corpus Christi* case, Continental's service was authorized by the same Railroad Commission permit that currently authorizes it to serve Grapevine.

█ Since the case was argued, the Texas Court of Civil Appeals has rejected many of the arguments that Continental advanced in this case. In Airport Coach Service, Inc., v. City of Fort Worth (Tex.Civ.App.—Tyler Dec. 5, 1974, not yet reported), the owner of a limousine service maintained among other things that Surtran's exclusion of his vehicles from D/FW Regional violated the anti-monopoly clause of the Texas Constitution. In affirming the lower court's action granting the defendants summary judgment, Judge Dunagan found that because Surtran operates at the airport *owned by* the cities, they have not created a prohibited monopoly.

If Texas case law were not clear enough that Surtran's operations do not violate the anti-monopoly laws, a look at the current statute would lead to the same conclusion. According to Tex.Bus. & Comm.Code Ann. § 15.01, a monopoly is a combination of two or more corporations effected in a certain manner. But a municipal corporation is specifically excluded by § 15.02(a) unless the context requires a different definition. No such definition is required here.

Accordingly, neither the Texas Constitution nor § 15.04 forbids the cities from operating Surtran.

## VIII. THE COMMERCE CLAUSE

█ The Framers authorized Congress "[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S.Const. art. I, § 8, cl. 3. Continental, in this branch of its case, argues that Dallas and Fort Worth have usurped federal and state agencies' authority to regulate commerce.

It is undisputed that Continental holds permits from both the appropriate regulatory agencies—the Interstate Commerce Commission and the Texas Railroad Commission—to serve Grapevine, Texas. Because the airport terminal buildings lie in Grapevine, Continental concludes that it therefore has federal and state authority to serve the airport. Neither the cities nor the Court can accept this conclusion. The permits were granted before the airport was constructed. Thus neither permit specifically authorizes Continental to serve the airport. This fact is the key to distinguishing the facts in this case from those in some of the cases upon which Continental relies.

For example, in Toye Bros. Yellow Cab Co. v. Irby, 437 F.2d 806 (5th Cir. 1971), the City of New Orleans had granted Toye an exclusive franchise to provide ground transportation between its airport and downtown. It sued to enjoin a competing carrier, Mississippi Coast Limousine Service, from offering direct service between the airport and the resort areas of the Mississippi Gulf Coast. The city forbade Coast to pick up and deliver passengers at the airport. The court found this act an unreasonable discrimination against an interstate carrier and an impermissible burden on interstate commerce. It is quite important to note that the ICC had issued Coast a permit specifically authorizing it to serve the *airport*—not New Orleans.

The *Southwest Airlines* case of Judge Taylor, *supra*, is no more comforting to Continental. It is true. the court said the City of Dallas could not exclude Southwest from Love Field so long as the airport remained open. What Continental fails to mention, however, is that Southwest held a certificate from the Texas Aeronautics Commission that not only specifically permitted it to serve Love Field, but also forbade it from ending its Love Field service without spe-

cial permission. *Southwest Airlines, supra*, 371 F.Supp. at 1030.

Continental also cites Park 'n' Fly of Texas, Inc. v. City of Houston, 327 F. Supp. 910 (S.D.Tex.1971), a case involving ground transportation at the Houston airport. Although interesting, that case does not help Continental. For one thing, as Judge Bue carefully noted, it did not question the city's right to grant exclusive contracts, franchises or concessions. 327 F.Supp. at 919. Nor did the case question the city's right to promulgate ordinances and regulations pursuant to a reasonable exercise of its policy powers. *Id.* What the court did determine was that a city ordinance burdened and obstructed interstate commerce, although facially neutral, by requiring certain shuttle buses to load and unload passengers at a more distant, dangerous and inconvenient site than other vehicles —especially those of the city's concessionaire—were allowed to use. The *Park 'n' Fly* case would be relevant if Continental were permitted to operate a D/FW Regional but were subjected to less favorable conditions than Surtran. The case is not relevant, however, because the cities are operating their *own* buses on their *own* property to the exclusion of *all* competitors. Continental is being treated no differently from, say, Greyhound, while in *Park 'n' Fly* the city treated its concessionnaire far more favorably than shuttle buses operated by hotels and motels.

Continental says that ICC and court rulings permit it to change its routes within a municipality at will if the ICC permit does not specify which streets shall be used. Therefore, it says, it can adjust its routes within Grapevine and stop at D/FW Regional terminals. Would it also be permitted to drive its buses through the depot of a competing bus company? Or perhaps the mayor's driveway? What Continental fails to recognize is that the airport is owned by the two cities; its roadways have not been dedicated to the public. Indeed, the four cities involved had adopted identical ordinances that have the effect of outlawing competition with Surtran. The ordinances must be discussed because of the case upholding the validity of the ICC ruling mentioned above, Salem Transportation Co. v. United States, 314 F.Supp. 693 (S.D.N.Y.1970), another airport case. The court dealt with an ICC holding that "if a certificate does not designate specific streets to be traveled within a municipality, it is permissible for a carrier . . . to change its route within that municipality at will, *subject only to police or other local regulation.*" 314 F.Supp. at 695 (emphasis added).

■ The cities of Dallas, Fort Worth, Irving and Grapevine have enacted ordinances adopting a resolution of the airport board requiring a permit from the board before a carrier may solicit or pick up passengers for hire at D/FW Regional.[6] The defendant cities rely on

---

**6.** Relevant portions of Dallas-Fort Worth Regional Airport Board Resolution 71–172, October 5, 1971, are as follows:

Chapter Two, Section 8. Solicitation of Ground Transportation

It shall be unlawful for any person to solicit ground transportation business on the Airport, or to pick up passengers or baggage for hire on the Airport without a ground transportation permit from the Airport Board, or *without having* an Airport Board Concession, License or Franchise therefor, and to the extent of any operations outside the Airport Boundaries, without a license, permit or franchise from any City through which said business is conducted if lawfully regulated by the ordinances of any such city.

Chapter Three, Section 4. Soliciting

(c) It shall be unlawful to solicit any business or trade, including transportation of persons or baggage for hire on the Airport without a permit, concession or franchise from the Airport Board, and, to the extent of any operations outside the Airport Boundaries, without a license, permit or franchise from any city through which said business or trade is conducted if lawfully regulated by the ordinances of any such city.

Chapter Four, Section 3. Penalty, Continuing Violations

The violation of any provision of this Code where an act or failure to act is made unlawful or is otherwise prohibited, shall be punishable by a fine not to exceed Two Hundred Dollars ($200.00), and each day a

several Texas statutes for their authority to pass the ordinances. Without unduly lengthening this opinion with a detailed examination of the statutes, suffice it to say that the Court has examined Vernon's Tex.Rev.Civ.Stat.Ann. arts. 1175 and 1176 (dealing with powers of home rule cities), 46d–2 (part of the Municipal Airports Act which, among other things, authorizes cities to police and protect their airports) and 1118w § 1 (which authorizes cities to own and operate street transportation systems) and finds no reason to label them invalid.

The Supreme Court of Florida has faced a similar situation in a case worthy of discussion here. Miami Beach Airline Service v. Crandon, 159 Fla. 504, 32 So.2d 153 (1947). The Dade County Port Authority, operator of Miami International Airport, granted an exclusive concession to a cab company to transport passengers from the airport to points around the city. Suit was brought to enjoin a competitor—which claimed a state railroad commission permit to do so—from picking up passengers at the airport. In affirming a decree granting the injunction, the court noted—as I have in this case—that the railroad commission permit did not specifically mention anything about serving the airport as distinguished from the surrounding city. The court next examined the state statute that authorized the port authority to operate the airport and reviewed state precedent, including railroad and terminal company cases. It concluded, as I do, that the governing body acted within the law in excluding competition. "The fact that the airport involved in this litigation was owned and operated by the Dade County Port Authority would make no difference in the rule," the court noted. 32 So.2d at 156. The Supreme Court of Colorado also has faced a similar situation concerning the City of Denver's operation of Stapleton Field. That case, too, upheld an exclu-

sive ground transportation concession that had been challenged by a competitor. Rocky Mountain Motor Co. v. Airport Transit Co., 124 Colo. 147, 235 P.2d 580 (1951).

In passing, I would add a word about the curious *effect* of the four cities' anti-bus ordinances quoted in note 6 *supra*. The ordinances prohibit *picking up* passengers at the airport, but permit *discharging* passengers who boarded elsewhere. It is this feature that gives Continental its most persuasive argument that the cities are unlawfully burdening interstate commerce, since, for example, it had been Continental's practice for many years during the Christmas season to bring special busloads of military servicemen to Love Field from bases as far away as Sheppard Air Force Base at Wichita Falls, some 150 miles from Dallas. After Christmas, Continental reversed the process, picking up the soldiers and airmen after their holidays at home—many in other states —and returning them to their bases. Under the ordinances now in effect, Continental is permitted to unload the servicemen at D/FW Regional. But on the return trip, the servicemen must get from the airport to Continental's terminal in Dallas or Fort Worth on their own—such as by riding Surtran for $2.-50—and then boarding a Continental bus in downtown. This is what I referred to earlier in this opinion when I wrote that one could question the wisdom of the cities' decision. But the decision does pass muster as to constitutionality and legality.

## IX.  CONCLUSION

Because the cities' operation of Surtran has been found to be legal, the declaratory judgment and injunction sought by Continental are denied. Continental's motion for summary judgment is denied. The cities are granted sum-

---

violation shall continue shall constitute a separate offense; provided, however, where the offense is one for which a penalty is

fixed by state law, the latter penalty shall govern.

mary judgment, and all costs of suit are taxed against plaintiff.

Counsel for the defendants will draw a form of judgment and submit it to the Court after obtaining the approval of plaintiff's counsel as to form.