**PARK 'N FLY OF TEXAS, INC.**

v.

**The CITY OF HOUSTON, a Municipal Corporation, et al.**

**Civ. A. No. 70-H-991.**

United States District Court,
S. D. Texas,
Houston Division.
May 17, 1971.

Theodore F. Schwartz, Ackerman, Schiller & Schwartz, Clayton, Mo., for plaintiff.

William A. Olson, City Atty., Winston P. Crowder, Senior Asst. City Atty., Houston, Tex., for defendants.

John F. Heard, Baker & Botts, Houston, Tex., for intervenor.

## MEMORANDUM AND ORDER

BUE, District Judge.

The plaintiff, Park 'N Fly, here brings suit against the City of Houston seeking a declaratory judgment that Municipal Ordinance No. 70–1951,[1] an ordinance

---

1. Houston, Texas, Ordinance 70–1951, November 4, 1970:

An Ordinance Defining Certain Words and Terms; Authorizing the Director of Aviation for the City of Houston to Establish Standing and Loading and Passenger Loading and Unloading Zones at Designated Locations at the Houston Intercontinental Airport; Regulating the Use of Such Standing and Loading Zones; Providing for Signs Designating all Loading and Unloading Zones; Regulating Advertising and Identification on Certain Vehicles; Providing for a Permit and Setting a Fee for Such Permit for Certain Vehicles for Operating on the Premises of Houston Intercontinental Airport; Providing for Liability Insurance for Certain Vehicles; Providing a Penalty Clause; Providing a Severability Clause; Repealing Ordinance 70–1389, Enacted the 12th Day of August 1970; Setting Enforcement Dates; Providing for the Inclusion of this Ordinance in the Code of Or-

dinances of the City of Houston; and Declaring an Emergency.

\* \* \* \* \*

. Whereas, the City of Houston, pursuant to provisions of Vernon's Revised Civil Statutes of the State of Texas, Articles 46d–1 through 46d–22, the "Municipal Airports Act," has constructed and is operating Houston Intercontinental Airport, in Houston, Harris County, Texas; and

Whereas, said statutes confer upon the City Council of the City of Houston the power to adopt, amend and repeal reasonable ordinances, resolutions, rules, regulations and orders as it deems necessary for the management, government and use of such airport; and

Whereas, the Charter of the City of Houston grants to the City Council the power to exercise all municipal powers necessary to the complete and efficient management and control of the municipal property, and to pass and enforce ordinances upon any subject, and in particular

to regulate drivers of baggage wagons and other vehicles, and to establish how and where hacks and other carriers shall stand or take their position near depots; and

Whereas, some of the operators of various vehicles used to transport persons and baggage onto and off of the premises of Houston Intercontinental Airport for compensation, whether direct or indirect, pay to the City of Houston, under contract or ordinance substantial sums of money for the privilege of using the Airport facilities for the purpose of loading and unloading persons and their baggage; and

Whereas, some of the operators of various vehicles used to transport persons and baggage onto and off of the premises of Houston Intercontinental Airport for compensation, whether direct or indirect, are not required to pay the City of Houston any fee for the privilege of using the Airport facilities for the purpose of loading and unloading persons and their baggage; and

Whereas, the City Council finds it desirable and necessary to regulate and control by ordinance the places of loading and unloading of those vehicles used to transport persons and baggage onto and off of the premises of Houston International Airport and to require permits of certain of these vehicles; now, therefor,

Be it Ordained by the City Council of the City of Houston:

Section 1. For purposes of this ordinance only, the following terms shall have the following meanings unless otherwise indicated herein:

(a) A "charter vehicle" is any vehicle licensed by the City or operating under a certificate of convenience and necessity issued by the Texas Railroad Commission and operated for hire that may transport persons and baggage from the Airport. Taxicabs, commercial vehicles (as that term is hereinafter defined) and vehicles operated by a ground transportation company under the terms of a written contract with the City authorizing such company to provide ground transportation for passengers and their baggage to and from the Airport, are excluded from the definition of "charter vehicle."

(b) A "commercial vehicle" is any vehicle that is used to transport persons to or from a location off the Airport to or from the Airport as a service necessary or incidental to another commercial transaction or service provided to or for any such person and for which latter commercial transaction or service the person, firm, company or corporation providing the transportation service or for whom the transportation service is provided receives consideration. Charter vehicles, taxicabs and vehicles operated by a ground transportation company under the terms of a written contract with the City authorizing such company to provide ground transportation for passengers and their baggage to and from the Airport, are excluded from the definition of "commercial vehicles."

Section 2. The Director of Aviation of City (hereinafter called "Director"), is hereby authorized to establish and designate convenient locations (hereinafter called "standing and loading zones") near the Air Passenger Terminal Buildings and at other locations on the Airport, taking into consideration public safety, welfare, convenience and the orderly and free flow of traffic throughout the Airport. Such spaces shall be for the nonexclusive use of authorized charter vehicles to pick up and load persons and their baggage. Picking up and loading of persons and their baggage at the Airport by the drivers of such vehicles shall be done only at such standing and loading zones and at no other locations on the Airport except with the prior written consent of said Director. Charges as hereinafter set out are hereby levied for the privilege of using such standing and loading zones by charter vehicles for the purpose of loading and picking up passengers and their baggage at the Airport.

Section 3. Each charter vehicle driver shall pay to the designated representative of the Director of Aviation at the time of loading passengers at the designated standing and loading zones a fee as set out in the following schedule:

| Passenger Capacity of Vehicle | Charge Per Vehicle |
| --- | --- |
| Up to 5 | $ 2.00 |
| 6 to 11 | 5.00 |
| 12 to 24 | 10.00 |
| Over 24 | 15.00 |

The Director is authorized to establish, with the approval of the City Controller, a monthly billing procedure (including the sale of coupon books) for those charter vehicle operators who frequently use the standing and loading zones.

Section 4. The Director is hereby directed to establish and designate locations (hereinafter called "passenger loading and unloading zones") near the Air Passenger Terminal Buildings on the South side, ground level, of said buildings for the nonexclusive use of commercial vehicles to load and unload persons and their baggage, taking into consideration the general public safety and welfare, the use of the area by all vehicles, the safety and convenience of all vehicles and their

passengers using said area, and the ability to maintain a free flow of traffic through said area.

Loading and unloading of persons at the Airport by the drivers or operators of such commercial vehicles shall be done only at such passenger loading and unloading zones and at no other locations at the Airport, except with the prior written consent of said Director. The use of said passenger loading and unloading zones by said commercial vehicles shall be for the sole purpose of unloading passengers and their baggage in the vehicle and for loading their customers and baggage that are waiting at said zone when the vehicles arrive. Commercial vehicles shall not park nor wait in said passenger loading and unloading zones and await the arrival of their customers nor utilize said zones for any other purpose or reason except those purposes specifically authorized herein. As soon as passengers aboard a commercial vehicle and their baggage are unloaded at the passenger loading and unloading zone or any customer waiting at said zone is loaded, the driver or operator of the commercial vehicle shall immediately remove the vehicle from said passenger loading and unloading zone.

Section 5. The Director is hereby authorized to post signs designating all loading and unloading zones set out in this ordinance.

Section 6. No sign, advertisement or display of any kind or nature shall be attached to or displayed on top of any commercial vehicle (as defined herein) except one that states the name of the owner or operator of the commercial vehicle. Such sign shall be a double faced, single sign, placed on the roof of the vehicle, and shall not exceed ten (10) inches in height and four (4) feet in length. Said sign may be illuminated in compliance with State Law but shall have no flashing, blinking, pulsating or rotating lights on same.

The design of any such sign shall be submitted to the Director for his approval before the sign is attached to the vehicle which approval shall be granted if the sign is of a design and style similar to the signs used on the Airport premises by tenants, concessionaires and lessees of the City.

Section 7.
(a) No commercial vehicle (as defined herein) shall operate on and within the premises of Houston Intercontinental Airport without a permit issued by the Director. Operation of a commercial vehicle without such a permit is an offense,

and punishable as set out in Section 9 hereof.

(b) Any person, partnership, corporation or association desiring a permit to operate a commercial vehicle on and within the premises of Houston Intercontinental Airport shall make application to the Director upon a form provided by the Director, and shall pay a ten dollar ($10.00) annual application fee for each vehicle at the time of making the application, except however, such fee shall be prorated on a quarterly basis, with all permits expiring December 31 of each year, except that permits issued during the year 1970 will not expire until December 31, 1971. The applicant shall furnish the following information with each application, which shall be sworn to before a Notary Public:

(1) Name and form of business under which the commercial vehicles will be operated. (If a partnership or corporation, a copy of the partnership agreement or articles of incorporation must be attached to the initial application and to any renewal application or additional vehicle applications if changes have occurred in such instruments since last being filed.)

(2) The address of the applicant; the mailing address of the applicant; and the person and address to whom the applicant desires City to direct all correspondence.

(3) Agent for service of legal process.

(4) The make, model, type and motor vehicle identification number of each vehicle for which a permit is desired.

(5) Proof of public liability insurance as required by Section 8, exemplified by a copy of the insurance policy or a certificate of insurance, which policy shall be issued in compliance with the laws of the State of Texas.

(6) Any other information the Director deems necessary to properly identify the owners of the business, the commercial vehicles, and the operators, drivers and owners of said vehicles.

(c) The Director shall design and issue a decal showing the permit number of each vehicle to which a permit has been granted. Such permit shall be valid, unless suspended or otherwise revoked, for the calendar year beginning January 1 and ending December 31, except the permits issued during the year 1970 and will not expire until December 31, 1971. The decal showing the permit number shall be displayed at all times and in the manner and location as required by the Director.

Section 8. Each commercial vehicle (as herein defined) operated on and upon the premises of Houston Intercontinental

Airport shall at all times be covered by a standard insurance policy of public liability and property damage in the following amounts:

| | | |
|---|---|---|
| (1) | For bodily injury or death of one person | $100,000.00 |
| (2) | For bodily injury or death of all persons | 300,000.00 |
| (3) | For property damage in any one accident | 50,000.00 |

Said policy shall contain provisions for continuing liability thereon up to the full amount thereof, notwithstanding any recovery thereon; and for the notification of the Director ten days prior to cancellation of the policy by either the insurer or the insured. Proof of renewal of policies shall be submitted to the Director at least 10 days before their effective date.

Section 9. Any person who fails or refuses to comply with the terms and provisions of this ordinance or who violates any provision hereof shall be guilty of an offense and upon conviction thereof shall be fined in an amount not to exceed $200.00. Each violation shall constitute a separate offense and be punishable as such. Upon the conviction of any person for a violation of this ordinance, the privilege of such person and the owner or operator of the vehicle involved to use the standing and loading zones and the passenger loading and unloading zones for the pickup and loading and unloading of persons and their baggage by such person and the owner or operator of such vehicle or by vehicles operated for or on behalf of such owner or operator at the Airport or any other location on the Airport may be terminated by City Council. The name of the person, firm, company or corporation appearing or displayed on a vehicle operated in violation of this ordinance shall constitute a rebuttable presumption that such vehicle is owned by or operated for or on behalf of such person, firm, company or corporation. The penalties and sanctions provided for herein shall be in addition to and not in lieu of any other legal remedies available to City to prevent and prohibit any such violation of this ordinance.

Section 10. If any provision, section, subsection, sentence, clause or phrase of this ordinance, or the application of same to any person or set of circumstances is for any reason held to be unconstitutional, void or invalid or for any reason unenforceable, the validity of the remaining portions of this ordinance or their application to other persons or sets of circumstances shall not be affected thereby, it being the intent of the City Council in adopting and the Mayor in approving this ordinance, that no portion hereof or provision for regulation contained herein shall become inoperative or fail by reason of any unconstitutionality or invalidity of any other portion, provision or regulation and to this end all provisions of this ordinance are declared to be severable.

Section 11. Ordinance No. 70-1389, enacted the 12th day of August 1970, and captioned:

An Ordinance Defining Certain Words and Terms; Authorizing the Director of Aviation for the City of Houston to Establish Standing and Loading and Passenger Loading and Unloading Zones at Designated Locations at the Houston Intercontinental Airport; Regulating the Use of Such Standing and Loading Zones; Providing for Signs Designating all Loading and Unloading Zones; Regulating Identification and Advertising on Certain Vehicles; Providing a Penalty; Providing a Severability Clause; Repealing Ordinance No. 69-984, Enacted the 28th Day of May, 1969; Setting Enforcement Dates; Providing for the Inclusion of this Ordinance in the Code of Ordinances of the City of Houston; and Declaring an Emergency.

is hereby repealed; provided, however, such repealing shall not affect nor authorize a dismissal of any pending prosecutions and complaints for violations thereof, theretofore filed.

Section 12. All provisions of this ordinance shall be enforced immediately upon passage and approval of the Mayor, except Sections 6 and 7, which shall not be enforced until thirty days after passage.

Section 13. This ordinance shall be made a part of the Code of Ordinances of the City of Houston.

Section 14. There exists a public emergency requiring that this ordinance be passed finally on the date of its introduction and the Mayor having in writing declared the existence of such emergency and requested such passage, this ordinance shall be passed finally on the date of its introduction, this 4th day of November, A.D. 1970, and shall take effect immediately upon its passage and approval by the Mayor.

Passed this 4th day of November, A.D. 1970.

Approved this 4th day of November, A.D. 1970.

/s/ Louie Welch
Mayor of the City of Houston

Approved:
/s/ Winston P. Crowder
Senior Assistant City Attorney

of the City of Houston, violates the Constitution of the United States, Art. I, § 8, and Amendment Fourteen. Plaintiff further seeks injunctive relief pursuant to 28 U.S.C. § 2201 et seq., compelling the city to abstain from enforcement of the aforementioned ordinance. Also seeking this relief are intervenors, Budget-Rent-A-Car of Houston, Inc. and Budget Valet Airport Parking Corp. of America.

The regulations complained of, plaintiff alleges, by definition and classification arbitrarily and discriminatorily isolate some two dozen vehicles, including the vehicles belonging to plaintiff and intervenor, thereby preventing them from the proper, equal and advantageous use of the passenger and baggage receiving areas of the Air Passenger Terminal Buildings of the Houston Intercontinental Airport. It is further alleged that this isolation and arbitrary classification do not bear any reasonable relation to the exercise of the police power referred to in § 4 of the ordinance; that, in fact, the net effect of the ordinance imposes an undue burden on interstate commerce and renders more difficult the fulfillment of the stated purpose of the ordinance.

The Houston Intercontinental Airport is one of the major commercial airport terminal facilities within the United States, connecting the Houston metropolitan area either directly or indirectly with other commercial airports within and without the United States.[2] It is served by eleven certificated airline carriers in the United States, ten of which are classified as major carriers, providing airline service for passengers and freight within and without the State of Texas. (Stipulation 4.)

All public streets, roads and highways terminate at the boundary of the Air-

port. The roadways located on the Airport have not been dedicated as public streets, but are open to the public, and provide the only means of ingress and egress for service transportation to and from the Terminal Building. (Stipulation 8.) There are two Terminal Buildings, each having an upper and lower level, both of which levels are directly accessible by vehicular transportation. (Stipulation 9.) The upper lobby level houses flight arrival and departure facilities, ticket counters, baggage check-in service, information counter, flight insurance counters, newsstands, food service areas, restrooms and other passenger conveniences. (Stipulation 10.) The lower levels of each Terminal provide a baggage claim area, car rental agencies, ground transportation service to Houston and surrounding areas, restrooms and barber shops. (Stipulation 11.) Skycaps, employed by the various airlines, are available to checking-in passengers at the upper level. Skycaps are also available to passengers at the lower lobby level, although generally they are not available to passengers checking in. (Stipulation 12.) A number of airlines further provide skycap service and baggage check-in on the upper level roadway of the Terminal Buildings. (Stipulation 14.)

An appreciable number of the passengers departing from Houston drive to the airport in their personal automobiles, and park at lots located on and off the airport premises. The on-airport parking facilities provided by the city include both "close parking" and "remote parking". The close parking facilities are at a convenient walking distance from the terminal, and courtesy vehicles known as "hustle-buses" have been provided without additional charge for the convenience of passengers using the remote on-air-

---

2. The Airport property was purchased and improvements constructed with both local and Federal funds, Federal funds being used for construction of the runways and instrument landing systems and property related thereto, and non-federal funds for the purchase of all other land and con-struction of all other facilities. The control tower at the Airport is owned and operated by the United States Government, and it regulates and controls all inbound and outbound air traffic at the Airport. Stipulations 6 and 7.

port parking facilities. Similarly, passengers who use off-airport parking as provided by the plaintiff and intervenor are also furnished transportation without additional charge to and from the parking lot and the airport via similar type "courtesy" buses. The total number of "courtesy" vehicles serving off-airport facilities such as hotels, motels, parking facilities and car rental agencies is approximately two dozen. Five of these are owned by plaintiff.

Plaintiff states that on August 12, 1970, the city enacted Ordinance 70–1389, providing for the promulgation of a regulation over the pick-up and discharge activities of courtesy vehicles. That ordinance was repealed on November 4, 1970, at which time the new ordinance, No. 70–1951, covering similar subject matter was enacted. This ordinance also regulates the pick-up and discharge of passengers and baggage transported by courtesy vehicles, by classifying vehicles under certain ordinance definitions and then specifying which facilities may be used by vehicles of each classification.

Ostensibly, the purpose for which the ordinance was enacted is "to establish and designate convenient locations * * * [for loading and unloading] near the Air Passenger Terminal Buildings and at other locations on the Airport, *taking into consideration public safety, welfare, convenience and the orderly and free flow of traffic* throughout the Airport." Section 2, Ordinance 70–1951. (emphasis added). *See also* Section 4 of Ordinance.

To effectuate this purpose, three of the classifications of passenger vehicles under the Ordinance, private automobiles excluded, are relevant to this case: The first two are specifically regulated, whereas the third category is unregulated: (1) charter vehicles, defined in § 1(a) of the ordinance encompasses buses, taxicabs and airport limousines; (2) commercial vehicles, defined in § 1(b), are composed of vehicles operated by off-airport hotels, motels, car rental agencies and parking companies and includes

those vehicles maintained by the plaintiff and intervenor; (3) a third classification, purportedly established by omission of certain vehicles in definitions under §§ 1(a) and 1(b), is comprised of courtesy vehicles operated by the city on-airport concessionaire and car rental agencies. (Stipulation 21.)

Park 'N Fly and Budget maintain that their vehicles should be properly defined as courtesy vehicles rather than commercial, and allege that the courtesy vehicles which they operate as well as those of other off-airport business firms are permitted to pick-up and discharge passengers and their baggage only on the lower level, south side of the Air Passenger Terminal Buildings, an area not designed for discharging passengers. It is further alleged that enforcement of the ordinance against "courtesy" vehicles other than those of plaintiff and intervenor included in the definition of commercial vehicles (those operated by hotels and motels) has been in the past largely disregarded. Furthermore, it is alleged that by not specifically regulating the "hustle-bus", a vehicle operated by the city parking concessionaire which provides *exactly the same service* to customers of the city's remote on-airport parking lot as do Park 'N Fly and Budget in their operations of off-airport parking, the ordinance again discriminates against plaintiff and intervenor.

It is undisputed that the "hustle-bus", private passenger cars, taxicabs, buses, and airport limousines may discharge passengers at either the upper level or lower level, whichever is preferable to the individual passenger. Furthermore, it is stipulated that the "hustle-bus" picks up passengers at the north side ground level entrances of the Air Passenger Terminal Buildings which are primarily for the use of private passenger vehicles. (Stipulations 15 and 21 (b)).

The alleged effect of this statutory treatment is to require vehicles maintained by plaintiff and intervenors to discharge passengers at the lower lobby level instead of the upper level which is

specifically designed and intended to receive passengers coming into the airport. As a result, airline passengers who are also customers of Park 'N Fly and Budget-Rent-A-Car are deprived, for the most part, of skycap service for convenient baggage check-in and transportation, as well as being exposed to inclement weather and to heavy traffic not encountered at the upper lobby level.[3]

Thus, it is alleged, that, not only is plaintiff's business operation discriminatorily and arbitrarily relegated to an inconvenient, disadvantageous and often dangerous loading and unloading zone, but also the air passenger's right to the full use of all public air commerce facilities at the Houston Intercontinental Airport is compromised when he contracts for and utilizes plaintiff's or intervenor's services.

## I.

This Court is vested with jurisdiction over significant federal questions pursuant to 28 U.S.C. § 1331. Specifically, plaintiff seeks injunctive relief from future enforcement and a declaratory judgment of unconstitutionality of Municipal Ordinance 70–1951 of the City of Houston, passed pursuant to state statutory authority. Defendants urge the court not to accept jurisdiction, arguing that there is no showing of exceptional circumstances resulting in irreparable loss which would necessitate the imposition of an injunction to afford adequate protection of plaintiff's constitutional rights.

In Spielman Motor Sales Co., Inc. v. Dodge, 295 U.S. 89, 95–96, 55 S.Ct. 678, 680, 79 L.Ed. 1322 (1935) the Supreme Court stated the correct rule as to enjoining the enforcement of a criminal statute:

The general rule is that equity will not interfere to prevent the enforcement of a criminal statute even though unconstitutional. * * * To justify such interference there must be exceptional circumstances and a clear showing that an injunction is necessary in order to afford adequate protection of constitutional rights. * * We have said that it must appear that "the danger of irreparable loss is both great and immediate"; otherwise, the accused should first set up his defense in a state court, even though the validity of a statute is challenged. There is ample opportunity for ultimate review by this Court of federal questions.

*See* Beal v. Missouri-Pacific Railroad Corp., 312 U.S. 45, 61 S.Ct. 418, 85 L.Ed. 577 (1941); Fenner v. Boykin, 271 U.S. 240, 46 S.Ct. 492, 70 L.Ed. 927 (1926); Ex parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). The rule, then, as to enjoining state officers from instituting *criminal actions* permits the federal court to act only where absolutely necessary for the protection of constitutional rights under extraordinary circumstances where the danger of irreparable loss is both great and immediate.

In City of Houston v. Jas. K. Dobbs Co., 232 F.2d 428 (5th Cir. 1956), the Court of Appeals for the Fifth Circuit affirmed a District Court decision in which the City of Houston was enjoined from enforcing a city ordinance prohibiting all persons except the airport concessionaire from selling food to be used on airlines operating from the Municipal Airport. There, the Court found that the ordinance effectively outlawed any such activity within the city limits of

---

**3.** It should be noted that plaintiff and intervenor request only limited use of the upper ramp, sufficient only to give adequate service to interstate passengers. Testimony of Mr. Martin Bloom, Chairman of the Board of Park 'N Fly of Texas, Inc., Tr. at 15–16.

At the time that we had free access to the airport we discharged probably 90 or 95% of our passengers on the lower level, on the inside line of the private passenger car side. *If a passenger had need of a skycap service we would take that passenger to the upper level.*

This is still our position today. We want the access to the upper level not for all of our pasengers but for *those that need the facilities* on the upper level. (emphasis supplied)

Houston, and penalized both the unauthorized sale and purchase of food destined for use on the airlines. The Court rendered no decision as to the validity of the ordinance "if it forbade only the deliveries on the airport property itself", ruling that the ordinance as a whole was violative of the federal Constitution, permitted the taking of property without due process, and bore no reasonable relation "to any power of regulation" held by the city. 232 F.2d at 430–431.

The Court, noting the applicability of the *Spielman* test, held that the requisite exceptional circumstances had been shown. In order to test the ordinance in state court, plaintiff would have been required not only to violate the measure, becoming subject to its penal provisions, but also to secure the agreement of his customers, by purchase to violate the ordinance and subject their employees to arrest and criminal prosecution.

And in Friend v. Lee, 95 U.S.App.D.C. 224, 221 F.2d 96 (1955), the Court stated:

> We think that the plaintiff has made at least a prima facie showing that he is being subject to unreasonable restrictions [in] * * * an activity which the defendants concede the plaintiff has the right to perform. Such conduct on the part of Government officials, if it actually has occurred, would be capricious and arbitrary. Where there is a threat of injury resulting from capricious or arbitrary performance of the regulatory functions of a Government agency, the Federal courts have in a wide variety of situations been ready to grant relief.

■ Having given serious consideration to the recent pronouncements of the United States Supreme Court sustaining and strengthening the rule against federal usurpation of state court matters,[4] this Court believes this case to be one in which exceptional circumstances are present, thereby warranting and, indeed, compelling the exercise of federal jurisdiction. There are precise reasons why this is so. In seeking to test the alleged constitutionality of the ordinance in state court, plaintiff must not only violate the ordinance, thereby subjecting Park 'N Fly of Texas, Inc. and its employees to continuing criminal prosecution and penalty, but further must run the real and immediate risk of having its permit to operate canceled by the City Council, as a consequence of such violation pursuant to Section 9 of the Ordinance, thereby losing the right to conduct any and all business operations at the Houston Intercontinental Airport. The danger of irreparable loss, then can be properly viewed as both great and immediate. Even if plaintiff might be ultimately successful in a state court test of the validity of the Ordinance, and might again succeed in securing a reissuance of his permit by City Council, it undoubtedly

4. *See* Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971); Perez v. Ledesma, 401 U.S. 82, 91 S.Ct. 674, 27 L.Ed.2d 701 (1971); Dyson v. Stein, 401 U.S. 200, 91 S.Ct. 769, 27 L.Ed.2d 781 (1971); Byrne v. Karalexis, 401 U.S. 216, 91 S.Ct. 777, 27 L.Ed.2d 792 (1971). Although these cases specifically treat First Amendment freedom of speech, they reflect a reaffirmation of the often stated policy against federal injunction of pending state criminal proceedings, and provide an excellent summation of the history of that issue. The case decided today is distinguishable in that, in addition to the penal provision of the ordinance, there are civil sanctions accruing upon violation, Mun.Ord. 70–1951 § 9 (1970), that initiate a threat to plaintiff's federally protected rights which "cannot be eliminated by his defense against a single criminal prosecution." Younger v. Harris, *supra*, at 42, 91 S.Ct. at 749; Byrne v. Karalexis, *supra*, at 220, 91 S.Ct. 777. It is also distinguishable in that the Supreme Court, in rendering the above cited decision, "[expressed] no view about the circumstances under which federal courts may act when there is no prosecution pending in state courts at the time the federal proceeding is begun." Younger v. Harris, *supra*, at 42, 91 S.Ct. at 749. Moreover, the *Spielman* test, applicable to the facts in the instant case, is reaffirmed. *Id.* at 42, 91 S.Ct. 746.

would have sustained significant loss. In the interim, its trade and its good will would have evaporated; its customers would of necessity be patronizing other competive parking lots which, apart from that of intervenor, are presently operated solely by the defendant's parking concessionaire. Moreover, inquiry by the Court during oral argument following testimony at the hearing as to the possibility of a satisfactory procedural remedy in State Court brought forth no satisfactory alternative to the retention of this cause in this Court.[5] Therefore, I find the case to be suitable for federal consideration and possible issuance of injunctive and declaratory relief.[6]

## II.

This Court having found that jurisdiction is properly taken, consideration must now be given to plaintiff's allegations that the ordinance violates the commerce clause by imposing an undue burden on interstate commerce and contra-

venes the due process and equal protection clauses of the Fourteenth Amendment to the Constitution. At the outset, it must be remembered that this case in no way questions the right of the city to grant exclusive contracts, franchises or concessions.[7] Nor does any statement contained herein question or seek to contravene the city's right to promulgate ordinances and regulations pursuant to a reasonable exercise of its police powers.[8]

█ It is well established that a State or city may validly regulate interstate commerce "as long as there is a real relation to the suitable protection of the people of the state and the regulation is reasonable in its requirements." Savage v. Jones, 225 U.S. 501, 32 S.Ct. 715, 56 L.Ed. 1182 (1912); Toye Bros. Yellow Cab Co. v. Irby, 305 F.Supp. 905, 910 (E.D.La.1969). But the principle that "a State may enact local laws under its police power in the interest of the welfare of the people, although they affect interstate commerce" until the area of

5. Defendant urges that Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971) and its companion cases show a lack of jurisdiction in this Court. It is alleged that plaintiff and intervenor here occupy a position similar to those plaintiffs in *Younger* not charged under the penal statute, but merely having fear of such charge, which parties were held to be improper.

> And persons having no fears of state prosecutions except those that are imaginary or speculative, are not to be accepted as appropriate plaintiffs in such cases.

401 U.S. at 42, 91 S.Ct. at 749. Defendant would apply this reasoning in the instant case.

> In the present case plaintiff and intervenor are both corporations. The penal aspect of the ordinance does not directly affect them. The drivers of the vehicles are the persons who would be charged for violating the ordinance. The corporation is penalized by action of the City Council after the employees violate the ordinance—if the corporation is penalized at all.

Defendants' Post Trial Brief at 2. While defendant is correct in a hypertechnical sense, the clearly foreseeable direct and indirect effects of a violation by employees of plaintiff and intervenor

are significant. It is patently unrealistic to believe that either corporation would long be able to retain employees for illegal work, subjecting such employees to penalties under the law. It is equally unlikely that the City Council would not take action to penalize a violator of the ordinance in question, that is, to withdraw Council approval for the corporation's license to operate, revoking same pursuant to § 9 of the ordinance. Thus deprived of employees and license, it matters little that the corporation is not directly liable for a monetary penalty. This is precisely the instance—one where a single state criminal adjudication cannot impart full relief—that there exists a need for declaratory and injunctive relief. 401 U.S. at 43-49, 91 S.Ct. 746. *See* n. 4, *supra*.

6. *See, e. g.*, City of Houston v. Jas. K. Dobbs Co., 232 F.2d 428 (5th Cir. 1956).

7. City of Walla Walla v. Walla Walla Water Co., 172 U.S. 1, 19 S.Ct. 77, 43 L.Ed. 341 (1898); Toye Bros., Yellow Cab Co. v. Irby, 437 F.2d 806 (5th Cir. 1971); Southerland v. St. Croix Taxicab Ass'n, 315 F.2d 364 (3d Cir. 1968).

8. *See, e. g.*, First Nat. Ben. Soc. v. Garrison, 58 F.Supp. 972, 980-981 (S.D.Cal. 1945) and cases cited therein.

regulation is preempted by Congress, is not applicable where the State or local government "passes beyond the exercise of its legitimate authority, and undertakes to regulate interstate commerce by imposing burdens upon it." First Nat. Ben. Soc. v. Garrison, 58 F.Supp. 972, 984 (S.D.Cal.1945) and cases cited therein (note and emphasis omitted). The inquiry, then, is twofold: (1) whether plaintiff is engaged in interstate commerce, and, if so, (2) whether the ordinance in question is a regulation which exceeds the exercise of the city's legitimate authority.

The actual point in time and place at which interstate commerce actually commences and ceases has been the subject of discussion in many varied fact applications. It has been held that the local operations of taxi cabs do not constitute a part of interstate commerce, United States v. Yellow Cab Co., 332 U.S. 218, 67 S.Ct. 1560, 91 L.Ed. 2010 (1947); Evanston Cab Co. v. City of Chicago, 325 F.2d 907 (7th Cir. 1963). Yet the fact that one portion of a journey "consists of transportation by an independent agency solely within the boundaries of one State does not make that portion of the trip any less interstate in character." The Daniel Ball, 77 U.S. (10 Wall.) 557, 565, 19 L.Ed. 999 (1871). Interstate commerce is an intensely practical concept, and the characterization of one portion of a journey must be made by viewing the logical relation of that portion of the entire journey. 332 U.S. at 229, 67 S.Ct. 1560; Stafford v. Wallace, 258 U.S. 495, 42 S.Ct. 397, 66 L.Ed. 735 (1922). Thus in United States v. Capital Transit Co., 338 U.S. 286, 70 S.Ct. 115, 94 L.Ed. 93 (1949) the Supreme Court found a motor carrier which operated buses and streetcars solely within the District of Columbia to be an integral part of an interstate movement. The Court reasoned that, although the defendant's vehicles never left the confines of the District, the fact that a large portion of the passengers occupying those vehicles were government employees traveling to or from Federal offices across the Potomac River in Virginia, effectively operated to bring defendants within the stream of interstate commerce. The Yellow Cab case, urged in contravention of that result, was found not to be controlling.

In a somewhat different context, that of the Fair Labor Standards Act, the employee of a parking concessionaire whose lots were adjacent to the Atlanta Municipal Airport was found to be engaged in interstate commerce. The Court looked at numerous factors in rendering its decision, among them, that the employer's lots were "used by airline passengers who leave their cars [in the lot] before plane flights, many of which are interstate." Jackson v. Airways Parking Co., 297 F.Supp. 1366, 1370–1373 (N.D. Ga.1969). The Court also found that the employer's lot was "almost totally—if not completely—dependent upon the existence of the airport for its revenue." Id. at 1373. Thus, the geographical location, the interstate character of the lot patrons, and the economic dependence on the airport all served to convince the court that the lot and its employees were directly related to the ultimate interstate transaction—the flight.

A careful reading of the cab cases confirms the opinion that the practical concept of interstate commerce may necessarily at times include travel occurring wholly within one state:

> We must * * * mark the beginning and end of a particular kind of interstate commerce by its own practical consideration.

Here we believe that the common understanding is that a traveler intending to make an interstate rail journey begins his interstate movement when he boards the train at the station and that his journey ends when he disembarks at the station in the city of destination. * * * From the standpoint of time and continuity, the taxi cab trip may be quite distinct and separate from the interstate journey. To the taxi cab driver, it is just another local fare.

United States v. Yellow Cab Co., 332 U.S. 218, 231–232, 67 S.Ct. 1560, 1567 (1947). The Court then went on to limit the applicability of the holding in that case:

> We do not mean to establish any absolute rule that local taxi cab service to and from railroad stations is completely beyond the reach of federal power * * *.
>
> All that we hold here is that when local taxi cabs merely convey interstate train passengers between their homes and the railroad station in the normal course of their independent local service, that service is not an integral part of interstate transportation.

*Id.* at 232–233, 67 S.Ct. at 1568.

It is easily discernible that the beginning and end of interstate commerce are not drawn by arbitrary lines, but by practical effect. In *Yellow Cab*, although the court found that cabs transporting purely local fares were not in interstate commerce, they held that a transfer company's operation of cabs wholly within the city between railway stations in the city was interstate in nature.

> When persons or goods move from a point of origin in one state to a point of destination in another, the fact that a part of that journey consists of transportation by an independent agency solely within the boundaries of one state does not make that portion of the trip any less interstate in character.

*Id.* at 228, 67 S.Ct. at 1566. *See* Atchison, Topeka & Santa Fe Ry. Co. v. City of Chicago, 240 F.2d 930, 936 (7th Cir. 1967). Obviously the plaintiff's and intervenor's activities here fall somewhere in between these extremes. They are not under contract with the airlines; by contrast, the transfer company did operate by contract with the railroad. And they do not transport passengers between two major terminals. But Park 'N Fly and Budget are directly and totally dependent economically upon the patronage of interstate travelers. Both

are in close physical proximity to an interstate facility. And their clientele, with obvious and considered forethought, commence and end their interstate sojourns at plaintiff's and intervenor's parking lots, rather than at the air terminal. As a rule, they are not concerned with "just another local fare". Instead, their customers are almost exclusively bound for interstate travel. It would be exceedingly difficult to read the cab cases as holding that interstate commerce arbitrarily and absolutely ends at the railroad station or air terminal. Under the circumstances present in this case, practicality and logic clearly dictate otherwise. *See, e. g.,* Southerland v. St. Croix Taxi Cab Ass'n, 315 F.2d 364 (3d Cir. 1963); Toye Bros. Yellow Cab Co. v. Irby, 305 F.Supp. 905 and 911 (E.D.La.1969) aff'd, 437 F.2d 806 (5th Cir. 1971). Accordingly, I find plaintiff's and intervenor's services in this case are an integral part of the interstate package.

### III.

As a consequence, the guidelines binding upon the city are these: it may not directly burden or obstruct interstate commerce, 240 F.2d at 936; Furst v. Brewster, 282 U.S. 493, 498, 51 S.Ct. 295, 75 L.Ed. 478 (1931); Michigan Pub. Utilities Commission v. Duke, 266 U.S. 570, 577, 45 S.Ct. 191, 69 L.Ed. 445 (1925); the city has no greater authority or control over plaintiff than to "incidentally and indirectly affect it by a *bona fide, legitimate,* and *reasonable* exercise of its police power" to the interest of public safety or the convenient and free flow of traffic. 240 F.2d at 936–938 (emphasis added). *Cf.* Continental Baking Co. v. Woodring, 286 U.S. 352, 52 S.Ct. 595, 76 L.Ed. 1155 (1932). If there is (1) a real relation to the protection of the health, welfare, and safety of the people, *and* (2) the regulation is reasonable in its requirements and classifications, the measure imposed by the state or city is a legitimate exercise of its power.

■ The presumption at the outset is that the ordinance is reasonable and desirable, and the burden is on the plaintiff to show that the measure unduly burdens interstate commerce in that the controls imposed in no way enhance the public safety or convenience, or that, even if there is a genuine purpose to be served by the law, it is fulfilled in an unreasonable or arbitrarily discriminatory manner.

■ A person challenging the validity of a state enactment is not bound by the legislative declarations of purpose contained within that statute or ordinance. He may show that the practical operation of the statute or of any program devised under the authority thereof directly burdens or effectively prevents the free flow of interstate commerce. Foster-Fountain Packing Co. v. Haydel, 278 U.S. 1, 49 S.Ct. 1, 73 L.Ed. 147 (1928). The Court of Appeals for the Fifth Circuit, in Toye Bros., Yellow Cab Co. v. Irby, 437 F.2d 806 (5th Cir. 1971) stated the rule thusly:

> Because state and local bodies have valid authority to prescribe regulations in many areas, the test of whether a particular state or local enactment conflicts with an exercise by Congress of its commerce powers entails ascertainment of whether the national interest in unfettered flow of interstate commerce outweighs local needs to protect public health, safety, welfare, or morals. Moreover, since conflicts with the commerce power are not always patent, it is often necessary for courts to determine whether a state or local enactment *not facially in conflict* is nonetheless (1) *in application* a discrimination against interstate commerce. * * * (emphasis supplied in part)

437 F.2d at 809. The context of that statement is somewhat different; there, the court found conflict with a specific act of the ICC under the federal commerce power, the granting of an ICC permit. However, the principle is the same where the city ordinance does not contravene a specific regulation or permit, but does confound the commerce clause by unduly burdening interstate commerce. First Nat. Ben. Soc. v. Garrison, 38 F.Supp. 972, 984 (S.D.Cal.1945) and cases cited therein.

The stated purpose of Municipal Ordinance 70–1951 falls within the legitimate exercise of the city's police power in attempting to regulate traffic in a convenient and safe manner. In reality, however, the ordinance arbitrarily discriminates against plaintiff, intervenor and the few vehicles classified as commercial which are run by hotels, motels and other such local facilities, requiring a use of the Air Terminal facilities *contrary to their intended use,* thus rendering more difficult and tenuous the actual fulfillment of that purpose.

■ The *Dobbs* case, though similar, and, I feel, controlling as to result, is distinguishable. The ordinance which was struck down in that case went inconceivably beyond the proprietary or police powers possessed by the city. On the contrary, in the present case, the stated purpose of the ordinance is valid, and regulations or classifications promulgated to effect that purpose would be legitimate fruits of a legitimate power, and would serve to aid, rather than to interfere with commerce. However, the three classifications of vehicles under the ordinance, two explicit and one implicit, are unreasonable classifications, and the scope of permitted activity by each class serves not to effectuate that policy, but to render impossible its fruition.

■ Plaintiff's and intervenor's shuttle buses cannot properly be said to be commercial vehicles, as they are not vehicles for hire or common carriers, but are in reality courtesy vehicles. Seemingly, the proper classification of these vehicles has not been previously judicially determined, although it has been raised. *See, e. g.,* Southerland v. St. Croix Taxicab Ass'n, 315 F.2d 364, 369 (3d Cir. 1963). In *Toye Bros., supra,* the Fifth Circuit speaks of similar ve-

hicles as "courtesy cars" and notes the distinction between them and common carriers. Certainly, this Court may take notice of the fact that the shuttle buses operated by plaintiff and intervenors and the shuttle cars operated by certain motels do not constitute revenue producing transit systems. There is no extra charge by either plaintiff or intervenors for such service. In fact, those vehicles *unregulated* under the ordinance, with the exception of the City's hustle-bus, are admittedly vehicles which should truly be classified as commercial:

> [T]his other [implied] class would include not only the vehicles operated on the airport by the Airport Parking Concessionaire, *but all other vehicles of a commercial nature* (suppliers of goods to the airport, construction vehicles, two and three wheeled vehicles, etc.). (emphasis supplied)

Defendant's post-trial brief at 12. The improper designation of plaintiff's vehicles as commercial, in itself, is not necessarily fatal to the ordinance. But assuming, *arguendo*, that the buses operated by plaintiff and intervenors are properly classified as commercial, there is no conceivably valid ground for drawing a distinction between these vehicles and the "hustle-bus" operated by the city airport parking concessionaire. It is this "singling out" of vehicles maintained by

the city concessionaire for the *identical courtesy service* offered by plaintiff, and then not subjecting them to the same classification or regulation, that transforms the classification system of the ordinance into one which is arbitrary and unreasonable and one which unduly burdens and discriminates against interstate commerce.

Finally, the total lack of evidence that there is truly any purpose to be served by the questioned sections of the ordinance other than to secure economic advantage over the competitors of the city's parking concessionaire brings me to the realization that this exercise of power by the city is an unreasonable and impermissible one. Purporting to be a traffic and safety ordinance, the sole actual purpose of the classification system in the ordinance is one of economic regulation. The city admits that no traffic studies or surveys have ever been made as to the most effective use of the air terminal facilities. Testimony of Mr. Weaver, Tr. at pages 47, 54.[9] The city acknowledges that city owned lots have been hurt financially due to the competition offered by plaintiff and intervenors. Defendant's trial brief at 23; testimony of Mr. Weaver, Tr. page 50. The inescapable conclusion is that the ordinance was drawn to cast plaintiff and intervenors in the role of supplying

---

9. In fact, unrefuted testimony by Mr. Bloom, Chairman of the Board of Park 'N Fly of Texas, Inc. brought out the fact that under the ordinance, plaintiff's vehicles are required to use the loading area already the most congested. Tr. at 11–12:

> Q. (By Mr. Schwartz, for the plaintiff) Prior to the ordinance being passed you were picking up exactly where?
> A. We were in the private passengers' side of the airport.
> Q. Where the private passenger vehicles are?
> A. That is correct.
> Q. Under the ordinance you are now with a number of other vehicles, is that right?
> A. We are in the opposite side of the airport. We are on the side delegated to the buses, the taxi-cabs and limousines.

> Q. Is the traffic considerably heavier there?
> A. Yes, sir. It sure is.
> Q. There are always cabs standing there and starting?
> A. That is correct.
> Q. There are always limousines standing and starting?
> A. Correct.
> Q. None of that exists on the private passengers' side?
> A. The private passengers' side is almost deserted.

Having examined and compared literally scores of photographs taken at various times and days, for comparison of the traffic load in various areas of the terminal, the Court is of the opinion that Mr. Bloom's testimony is an adequate representation of the general traffic concentrations under normal circumstances.

inferior parking service to airport passengers in order that the city's competitive advantage might be enhanced.

The insight evidenced by Judge Ben C. Connally in the District Court opinion in Jas. K. Dobbs Co. of Dallas, Inc. v. The City of Houston, et al., C.A. No. 8869 (June 1, 1955) is apposite here:

In full recognition of the fact that in determining the validity of a statute or ordinance a Court may not look to the motive which prompted the legislative body in making the enactment, but must have recourse solely to the effect which the enactment will have in operation (J. H. McLeaish & Co. v. Binford [D.C.], 52 F.2d 151; Peoples Petroleum Prod. v. Sterling [D.C.], 60 F.2d 1041), it may not be amiss to point out that the lease between the City and its new concessionaire provides that the rental to be paid by the latter to the City is determined by a fixed percentage of his gross sales. Hence it may be that the City Council, in destroying plaintiff's business, was prompted not by a desire to serve any public ends, but by the less worthy motive of seeking in this manner to swell its own purse.

The Court, often viewed as enjoying a certain isolation from the realities of life, feels obligated to digress momentarily from Constitutional repartee to register its awareness of the true issues at stake here. As was pointed out by counsel during oral argument at the hearing, negotiations between Park 'N Fly and the City had been under way based upon a fixed percentage of the plaintiff's revenue from its parking lot operations, but thus far had been unsuccessful.[10] This Court at the hearing urged renewal of such negotiations in an effort to resolve the dispute. It is ob-

---

10. Examination of Mr. Martin Bloom, Chairman of the Board of Park 'N Fly of Texas, Inc. at oral hearing, Tr. 20–22.

Q. (Recross exam by Mr. Crowder, for the City) Do you at the present time pay any consideration other than your registration fee to the city for the privilege of conducting a portion of your business on the airport property:

A. No, sir. We don't pay any consideration.

* * * * *

Q. (Redirect exam by Mr. Schwartz, for the plaintiff) Mr. Bloom, what purpose would be served by your paying a consideration to the City?

A. We pay consideration to four Cities and we pay specifically for a parking place with identification which is for our exclusive use at a convenient spot at the terminal building.

Q. *Have you in fact offered to do that here?*

A. *Yes, sir. We have.*

Q. *And has that been denied?*

A. *Yes, sir. It has.*

Q. And that would be for a specific area, a *sign saying* "PARK 'N FLY Pickup Point" or "Budget Pickup Point"?

A. That is correct.

Q. The City has refused that offer?

A. That's correct.

Q. Is that offer similar to others you operate throughout the country?

A. We offered identically the same as we pay elsewhere and they laughed at us.

* * * * *

Q. (By the Court) In terms of monetary charge what is the charge for registration?

A. I believe, it is only $10 per year per vehicle. I may not be accurate, but it is such a minor amount we didn't worry about it.

Q. What would it be, or is it a matter of negotiation, in other cities? Would you simply sit down and talk with the representative or is it a set fee?

A. The only place where we pay is where a parking place has been made available to us, and we have paid between two and a half and five percent of our gross revenues for the extra benefit which our business receives from being treated as a concessionaire with facilities on the airport premises.

At the other cities where we do not have an assigned parking place on the airport we pay nothing, not even a vehicle registration fee. (emphasis supplied)

Testimony reflects that Park 'N Fly also operates, performing the same type of service, in New Orleans, St. Louis, Cleveland, San Francisco and Montreal. Tr. at 8.

vious now, as evidenced by the remarkable growth of the City's off-airport parking facilities and the even-lower-than-competitive rates charged for that parking at this time, that the City is engaged in an economic vendetta with plaintiff, in aid of which this ordinance including the current amended version was enacted. Whether or not the City ultimately succeeds in undermining or destroying plaintiff's and intervenor's businesses, it will have to pursue its course without the aid of Ordinance 70–1951, inasmuch as this Court views the enforcement of Municipal Ordinance 70–1951 in this instance as a burden and obstruction to interstate commerce.

The authorities cited by the City do not lead to a contrary result. Bellew v. City of Houston, 456 S.W.2d 185 (Tex. Civ.App.—Houston 1970, writ ref'd n. r. e) upheld the grant of an exclusive concession by the city to Greater Houston Transportation Company to provide taxi service at the airport. The authority of the city to effect such a contract is not questioned, the limitation upon that power being that the city must not discourage or obstruct the competitive efforts of companies seeking the award of that exclusive contract. United States v. Yellow Cab Co., 332 U.S. 218, 229, 67 S.Ct. 1560, 91 L.Ed. 2010 (1947).

The other cases urged by the city in support of its position that it may regulate plaintiff's operations are likewise inapplicable. Parker Bros. & Co. v. City of Hunter's Creek Village, 459 S.W.2d 915 (Tex.Civ.App.—Houston 1970, no writ); City of Amarillo v. Griggs Southwest Mortuary, Inc., 406 S.W.2d 230 (Tex.Civ.App.—Amarillo 1966, writ ref'd n. r. e.); Mooney v. City of San Antonio, 386 S.W.2d 638 (Tex.Civ.App.—San Antonio 1965, writ ref'd) all uphold the exercise of the city's police powers in regulating or prohibiting certain commercial use of city streets. There is no interstate commerce involved; the regulations and the traffic regulated are purely local. And those cases correctly held that "no person has a vested right to use [city] streets * * * [for] commercial business." 406 S.W.2d 230 at 233.

## IV.

Plaintiff must satisfy a more stringent test in order to set aside a statutory determination as a denial of the Fourteenth Amendment's guaranty of equal protection of the laws. That is, "if any state of facts reasonably may be conceived to justify [the ordinance]," it must be sustained. Metropolitan Casualty Insurance Co. v. Brownell, 294 U.S. 580, 55 S.Ct. 538, 79 L.Ed. 1070 (1935). A statute is given the presumption of constitutionality, the burden lying on the plaintiff to show that the classification is arbitrary and unreasonable, Goldblatt v. Town of Hempstead, 369 U.S. 590, 82 S.Ct. 987, 8 L.Ed.2d 130 (1962). And merely because the classification "is not made with mathematical nicety" it is not offensive, Lindsley v. National Carbonic Gas Co., 220 U.S. 61, 78–79, 31 S.Ct. 337, 55 L.Ed. 369 (1911).

This case, however, is not one which throws the Court into the realm of mathematical niceties. It need not be concerned with such subtleties, for none exist. The city has simply classified all of a certain type of vehicle as commercial, except for the vehicles of that same type and use owned by the city concessionaire; as a consequence, it has denied access to the upper level passenger discharge area to buses of plaintiff and intervenor, and it has relegated such vehicles to an unloading zone not properly designed or equipped for that purpose. There is no basis for the distinction, much less a reasonable one. In fact, the area designated for use by such buses in loading and unloading passengers seems generally to be *more* congested than the areas properly designed for unloading at the upper level. *See* plaintiff's exhibit No. 1.

When the City through its Director of Aviation issued permits to Park 'N Fly and Budget pursuant to the provisions of the Ordinance, it could only be on the

basis that they would be able to conduct their regular business on the airport premises. Such permits cannot be utilized to diminish or restrict the quality of their operations, even though they are in direct competition with the city's parking concessionaire. Had the city acted for a purpose legitimately within its power, the designation of different loading areas might be justifiable and reasonable. Instead, a factor not properly subject to control by the city's power existed in the decision to promulgate the disputed sections of the ordinance: to secure economic advantage over competitors.[11] Thus, I find that the ordinance denies plaintiff and intervenor the equal protection guaranteed them by the Fourteenth Amendment.

## V.

■ The ordinance offends in a third sense. Although it is not necessary to this Court's decision, since the measure has been found to be violative of the Constitution on two other grounds, a third fault merits exposition. This facet, basic to the rationale of the commerce clause, but also important in its own right, is the right of the passenger to a reasonable and convenient use of the interstate facilities at the terminal. In Donovan v. Pennsylvania Co., 199 U.S. 279, 26 S.Ct. 91, 50 L.Ed. 192 (1905), the court upheld an exclusive contract prohibiting all cab companies but one from using railroad facilities for the solicitation of business, but not precluding cabs from receiving passengers from whom orders had been previously received. The court noted that the rail company, devoted as it was to public use, could regulate the use of the property only if "such rules are reasonable and consistent with the obligation to the public;" that the facilities "must be devoted primarily to public objects without discrimination among passengers and shippers."

In Delaware, Lackawanna & Western R. R. Co. v. Town of Morristown, 276 U.S. 182, 48 S.Ct. 276, 72 L.Ed. 523 (1928), the court reaffirmed the rail company's obligation "of providing a suitable way for [the passengers] to reach and leave its station." Id. at 192, 48 S.Ct. at 278. And in Griswold v. Webb, 16 R.I. 649, 19 A. 143 (1899) the court stated:

> Every passenger has the right, upon the premises of the carrier, to reasonable and usual facilities for arrival and departure; and so far as this includes the right to be taken to and from a station or wharf, it is immaterial whether he goes in a private or hired carriage.
>
> * * * [The] company cannot deprive a passenger of the ordinary right and privileges of a traveler, among which is the privilege of being transported from the terminus in a reasonable convenient and usual way. A company cannot compel a passenger to take one of certain carriages, or none at all; nor impose unreasonable restrictions which will amount to that.

Defendant would dismiss these cases as inapplicable in that they are concerned with the right of passengers to have hired vehicles pick them or their baggage up when such vehicle is not the one with whom the depot or terminal has an exclusive contract for providing transfer service. While the cases are indeed distinguishable on the facts, they correctly cite the universal principle that regulation over the use of interstate facilities must not be exercised "so as to cause unjust discrimination among passengers." See State ex rel. Burr v. Jacksonville Terminal Co., 90 Fla. 721, 106 So. 576. It is in this limited application that this Court looks to the cited authorities.

## VI.

This dispute is clearly one that should have been resolved amicably by the parties. There has not been, nor is there

---

11. See Defendant's trial brief at 23; testimony of Mr. Weaver, Chief of Properties, Aviation Department of the City of Houston, Tr. at 50.

now the slightest indication that additional time will precipitate further discussions. Accordingly, the issues before the Court merit adjudication without further delay.

Inasmuch as this Court views § 1 of Ordinance 70–1951, which section sets out the terms and definitions upon which the remainder of the ordinance is predicated, to be impermissible, the severability provided for in § 10 cannot be applied with practicality. I therefore am of the opinion and so declare that all relevant provisions of said Ordinance which are challenged by plaintiff and intervenor in this suit are unconstitutional, void and unenforceable for the reasons stated in this Memorandum and Order. Defendants, their agents, employees and successors are hereby permanently enjoined from enforcing such provisions of Ordinance 70–1951 of the City of Houston against plaintiff and intervenor as heretofore stated.

This Order constitutes the Court's Findings of Fact and Conclusions of Law.